

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INDICTMENT |
| | ) | **1 : 16 C R   124** |
| Plaintiff, | ) | |
| | ) | CASE NO. **JUDGE GWIN** |
| v. | ) | |
| | ) | |
| SIROUS ASGARI, | ) | Title 18, United States Code, Sections |
| | ) | 1832(a)(1) and (2), 1343, and 1546(a) |
| Defendant. | ) | |

The Grand Jury charges:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

Defendant and Entities

1. Defendant SIROUS ASGARI ("ASGARI") was a citizen of Iran and employed as a Professor at Sharif University of Technology ("Sharif University") in the Department of Material Science and Engineering. ASGARI was educated and worked as a research scientist in the field of metallurgical science. Sharif University was a state-operated, public research university in technology, engineering, and physical sciences in Tehran, Iran.

2. Company A, a company known to the Grand Jury, was an entity that manufactured commercial and industrial products. Company A was headquartered in the Northern District of Ohio, and did business in over 70 different countries, including those in Europe and the Middle East.

3. University A, known to the Grand Jury, is located in Cleveland, Ohio. Laboratory A, known to the Grand Jury, was a research and development ("R&D") laboratory located on the campus of University A that operated under a sponsored research agreement between Company A and University A. Laboratory A was funded in part by a non-profit foundation related to Company A and by revenue generated from conducting a range of R&D projects sponsored by private and public entities ("Sponsored Projects"). Laboratory A had an extensive set of R&D-related equipment, including 20 precise, sophisticated testing instruments that were run by several full-time engineers. University A independently managed and operated Laboratory A. Company A was provided with access to Laboratory A under the terms and provisions of a sponsored research agreement.

### The Navy Project

4. University A was conducting a R&D Sponsored Project that was funded by the United States Navy Office of Naval Research which used Laboratory A's staff, facilities and R&D equipment. This R&D Sponsored Project involved researching and developing the application of Company A's unique technology to create and produce anti-corrosive stainless steel for multiple potential uses for the Navy (hereinafter "the Navy Project"). University A employees and graduate students worked on the Navy Project in consultation with Company A employees.

5.  The Navy Project involved testing and developing improvements to an existing, unique Company A technological process (hereinafter the "Company A Process") to harden and strengthen stainless steel and increase its anti-corrosive properties. The Company A Process had been designed as a means to produce commercially viable, less expensive stainless steels that exhibited many similar characteristics and attributes as more expensive forms of specialty metals. The Company A Process was part of Company A's interstate and foreign business and was important to the overall success of Company A's product lines. Company A patented the Company A Process and undertook specific and practical measures to protect the Company A Process, as well as seeking to protect ongoing R&D work on improvements to this technology that have not been patented. Under existing company policy and practice, Company A did not provide any raw data or proprietary technical information about the Company A Process to any customers or competitors.

6.  Company A required that every student or University A employee who worked on the Navy Project at Laboratory A sign a written non-disclosure agreement with Company A (the "NDA"). Company A permitted any form of academic publishing by University A only after pre-publication review and approval by Company A. Company A provided raw data or proprietary technical information on the Company A Process to employees of University A or Laboratory A, or any person Company A believed to be part of the University A research team, only on a need-to-know basis. Any such raw data or proprietary technical information was to be applied only to the dedicated R&D project, such as the Navy Project, subject to the non-disclosure agreement, and could not be used for any other purpose.

### Nonimmigrant Visas

7. A nonimmigrant B-1/B-2 Business/Tourism visa did not authorize a person to work in the United States or authorize an academic or scientific researcher to conduct research at United States institutions that would benefit the United States institution. Any academic or scientific researcher who intended to conduct research work that would benefit a United States institution was required to obtain either an H-1B Temporary Worker visa or a J Exchange Visitor visa.

### Factual Allegations

#### 2011-2012 Trip to the United States

8. On or about December 12, 2011, ASGARI entered the United States on a tourist B-2 visa. On or about February 15, 2012, ASGARI departed the United States. As part of the official tourist B-2 visa application process, ASGARI reported to an official with the U.S. Department of State that the purpose of his travel to the United States was to visit his children. ASGARI provided specific information as part of this official application process that the places he planned to visit were "NEW YORK-PENNSYLVANIA-FLORIDA-LA." At no point in his tourist B-2 visa application process, or at any later time for the purpose of adding or correcting any official visa documentation, did ASGARI ever disclose his then existing intention and plan to work at University A and Laboratory A in Cleveland. Contrary to the specific information he provided to the Department of State that was required to obtain his tourist B-2 visa, during this trip ASGARI traveled to Ohio to work and conduct research at University A and Laboratory A.

#### 2012-2013 Trip to the United States

9. On or about November 4, 2012, ASGARI entered the United States again on a B-1/B-2 visa. ASGARI departed the United States on or about April 30, 2013. As part of the

4

official nonimmigrant B-1/B-2 visa application process, ASGARI reported to an official with the U.S. Department of State that the purpose of his travel to the United States was to visit his children. On the official visa application form, ASGARI stated that his specific purpose for traveling to the United States was for "TOURISM/MEDICAL TREATMENT." ASGARI provided a specific address in the State of New York as his destination. At no point in his nonimmigrant B-1/B-2 visa application process, or at any later time for the purpose of adding or correcting any official visa documentation, did ASGARI ever disclose his then existing intention and plan to work at University A and Laboratory A in Cleveland. Contrary to the specific information he provided to the Department of State that was required to obtain his nonimmigrant B-1/B-2 visa, during this trip ASGARI traveled to Ohio in order to work full-time at University A and Laboratory A. Prior to his nonimmigrant B-1/B-2 visa application process with the Department of State, ASGARI had both: (i) informed an employee of University A that his intention and objective was to seek employment and research work at University A while in the United States, and (ii) communicated on multiple occasions with an employee of University A seeking assistance in arranging research and employment opportunities for ASGARI at University A. After arriving in the United States on or about November 4, 2012, ASGARI traveled to Cleveland, Ohio to begin working on or about November 21, 2012, at University A and Laboratory A on the Navy Project. While working at University A and Laboratory A, ASGARI worked primarily, if not exclusively, on the Navy Project until he departed the United States on or about April 30, 2013.

Non-Disclosure Agreement (NDA)

10. On or about November 21, 2012, ASGARI signed a NDA regarding information obtained from Company A. The agreement required that ASGARI "hold all of the data and

5

information provided in strict confidence." In the NDA, ASGARI acknowledged that "much of the material obtained or to be obtained from [Company A], or from third parties on behalf of [Company A], the disclosure of which to, or use by, third parties could be damaging ('Confidential Information')." Further, the NDA defined "Confidential Information" to include "trade secrets, design documents, drawings, prints, know-how specifications, flowcharts, worksheets, data, reports, software, whether in human-readable or machine-readable form, documentation, correspondence, and information concerning its products, designs, and manufacturing processes, distribution, finances, sales and purchasing practices, and personnel in any form, originated by, licensed to, or prepared for [Company A]." In the NDA, ASGARI agreed "not to make any use of the Confidential Information except in furtherance of [his] business with [Company A], nor disclose the Confidential Information to any third party without written consent of [Company A]." The NDA further stated that all Confidential Information belonged "exclusively to [Company A]." Had ASGARI not signed the NDA, he would not have been able to gain access to information about the Navy Project or the Company A Process from Company A.

## Email Accounts

11. While in the United States, ASGARI was provided with an email account from University A (hereinafter, "University A Email Account"). ASGARI used the University A Email Account to communicate with employees of Company A, such as research scientist S.C., a person known to the Grand Jury, to request and receive information. University A email accounts, such as the one provided to ASGARI, used an email server that was located outside the State of Ohio. Emails sent to or from this account went through the server located outside the State of Ohio. ASGARI also maintained a personal email account (hereinafter, "Personal Email

Account") from a service provider located outside the State of Ohio. Emails sent to or from this account went through the service provider's server located outside the State of Ohio. ASGARI used his Personal Email Account to communicate with individuals in Iran while he was in the United States, including communicating Company A's technical information and data that ASGARI had obtained from Company A, which was subject to the NDA. ASGARI did not disclose to either Company A or University A that he was sending Company A information to persons in Iran. ASGARI also sent messages between his University A Email Account and his Personal Email Account, allowing him to access the information in those messages after he returned to Iran.

### Work on the Navy Project

12. As part of the Navy Project, ASGARI had access to data about the Company A Process, samples of metals treated by the Company A Process, research into improvements on the Company A Process, and other information from Company A. ASGARI also had the opportunity to interact with other researchers working on the Navy Project. ASGARI used advanced instruments at Laboratory A that were not available to him in Iran to conduct tests. ASGARI also used his position while on the Navy Project to obtain physical samples of metals treated with the Company A Process. He further obtained technical data related to the Company A Process from Company A employees, such as S.C.

### Return to Iran

13. On or about April 30, 2013, ASGARI returned to Iran. When ASGARI departed the United States, he transported samples of metals treated with the Company A Process to Iran without Company A's permission.

7

14. After returning to Iran, ASGARI, along with other individuals known to the Grand Jury, marketed the Company A Process data and research that ASGARI obtained while working at University A to Iranian companies and governmental institutions without Company A's permission. ASGARI promoted the Company A Process for use in military, nuclear, industrial, and energy applications. ASGARI also sent the Company A samples he obtained in the United States to other laboratories in Iran and Germany for testing without Company A's permission. Further, ASGARI took steps to obtain equipment similar to that which would be necessary to replicate the Company A Process in Iran.

## STATUTORY VIOLATIONS

### COUNT 1
### (Theft of Trade Secrets)

The Grand Jury further charges:

15. Paragraphs 1 through 14 are re-alleged and incorporated by reference herein.

16. From on or about November 4, 2012, through on or about April 30, 2013, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant SIROUS ASGARI, with intent to convert a trade secret, that is related to or included in a product used in and intended for use in interstate and foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending and knowing that the offense would injure Company A, did knowingly steal, and without authorization appropriate, take, carry away, and conceal and without authorization copy, duplicate, sketch, draw, photograph, download, upload, alter, destroy, photocopy, replicate, transmit, deliver, send, mail, communicate and convey a Company A proprietary trade secret, to wit: technical specifications regarding the progressive steps of heat treatments using Company A's process for the treatment of metals.

All in violation of Title 18, United States Code, Sections 1832(a)(1) and (2).

## COUNTS 2-12
### (Wire Fraud)

The Grand Jury further charges:

17. Paragraphs 1 through 14 are re-alleged and incorporated by reference herein.

18. From on or about November 4, 2012, through on or about October 23, 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant SIROUS ASGARI, devised a scheme and artifice to defraud, and to obtain property by means of materially false and fraudulent pretenses, representations, and promises.

19. It was part of the scheme that ASGARI worked on the Navy Project at Laboratory A, which was a joint University A and Company A R&D project funded by the Navy. In order to work on the Navy Project and gain access to confidential information from Company A, to which he would not otherwise be permitted access, ASGARI signed an NDA with Company A. In the NDA, ASGARI agreed not to use any confidential information he obtained except in furtherance of his business with Company A and not to disclose any Confidential Information to third parties without the written consent of Company A. Despite signing the NDA in which he made these promises, ASGARI attempted to use the confidential information he obtained to benefit himself and businesses and governmental institutions in Iran. ASGARI also disclosed the confidential information to third parties. As a result of the misrepresentation he made when signing the NDA, ASGARI gained access to data and information about Company A's Process for the treatment of metals, samples of metals treated by Company A's Process, and other information about Company A that was not publicly available.

20. It was further part of the scheme that ASGARI used email to communicate with Company A's employees to request and receive information about Company A's Process for the treatment of metals. ASGARI also used email to send data about the Company A Process he

9

obtained to individuals in Iran, including F.B., a person known to the Grand Jury. ASGARI also sent Company A information from his University A Email Account to his Personal Email Account, allowing him to access the data and information in Iran. ASGARI also provided instructions by email to individuals about sending Company A metal samples for laboratory testing. Finally, ASGARI used email to communicate with individuals in Iran regarding proposals for using and benefitting from the information obtained from Company A.

21. For the purpose of executing the scheme and artifice, ASGARI, did, on or about the dates below, knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of wire communication, certain signs, signals, pictures and sounds, to wit: emails, as listed herein below, each of which was an interstate or foreign wire communication constituting a separate and distinct offense:

| Count | Date of Email | From/Location | To/Location | Summary of Contents |
|---|---|---|---|---|
| 2 | January 14, 2013 | ASGARI (University A Email Account)/Ohio (through server located outside Ohio) | S.C./Ohio | Request for information about samples treated by Company A Process |
| 3 | January 29, 2013 | S.C./Ohio | ASGARI (University A Email Account)/Ohio (through server located outside Ohio) | Included a table with heat treatments for samples treated by Company A Process |
| 4 | February 18, 2013 | ASGARI (University A Email Account)/Ohio (through server located outside Ohio) | S.C./Ohio | Request for information about samples treated by Company A Process |
| 5 | February 19, 2013 | ASGARI (Personal Email Account)/Ohio (through server located outside Ohio) | F.B./Iran | Data from results of tests performed on Company A metal samples |
| 6 | February 21, 2013 | ASGARI (University A Email Account)/Ohio (through server located outside Ohio) | ASGARI (Personal Email Account)/Ohio (through server located outside Ohio) | Data from results of tests on metals performed by Company A |

| Count | Date of Email | From/Location | To/Location | Summary of Contents |
|---|---|---|---|---|
| 7 | February 21, 2013 | ASGARI (Personal Email Account)/Ohio (through server located outside Ohio) | F.B./Iran | Data from results of tests on metals performed by Company A. |
| 8 | March 13, 2013 | ASGARI (University A Email Account)/Ohio (through server located outside Ohio) | ASGARI (Personal Email Account)/Ohio (through server located outside Ohio) | Company A report on metal composition of samples |
| 9 | April 15, 2013 | ASGARI (University A Email Account)/Ohio (through server located outside Ohio) | ASGARI (Personal Email Account)/Ohio (through server located outside Ohio) | Information obtained from Company A, including invoices, mill run tags, and chemical test results |
| 10 | October 17, 2013 | F.B./Iran | ASGARI (Personal Email Account)/Iran (through server located outside Ohio) | Proposal regarding uses of metal treated with Company A process in nuclear reactors, petrochemical industry, and other fields |
| 11 | December 13, 2013 | F.B./Iran | ASGARI (Personal Email Account)/Iran (through server located outside Ohio) | Proposal about: (i) ASGARI's research in the United States, where he had obtained experimental samples, and (ii) its nuclear, military, and petrochemical uses |
| 12 | October 23, 2014 | F.B./Iran | ASGARI (Personal Email Account)/Ohio (through server located outside Ohio) | Proposal for laboratory in Germany to conduct testing on metal sample treated with Company A Process |

All in violation of Title 18, United States Code, Section 1343.

## COUNT 13
### (Visa Fraud)

The Grand Jury further charges:

22. Paragraphs 1 through 14 are re-alleged and incorporated by reference herein.

23. From on or about June 25, 2012, through on or about April 30, 2013, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant SIROUS ASGARI, did knowingly use and possess a nonimmigrant visa in the name of SIROUS ASGARI, which the Defendant then knew to have been procured by means of a false claim and statement and otherwise procured by fraud and unlawfully obtained, to gain entry into the United States and, after his entry into the United States, as evidence of authorized stay while he remained in the United States, in that the defendant had fraudulently obtained the B-1/B-2 nonimmigrant visa by falsely represented in his visa application that his primary purpose in visiting the United States was for "TOURISM/MEDICAL TREATMENT," when he then knew that his intention and primary purpose of entering and staying in the United States was to work at Laboratory A at University A in Cleveland, Ohio.

All in violation of Title 18, United States Code, Section 1546(a).

A TRUE BILL.

Original document - - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002