# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO: 1:16-CR-124 |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE JAMES S. GWIN |
| -vs- | : | |
| | : | **DEFENDANT SIROUS ASGARI'S** |
| SIROUS ASGARI, | : | **MOTION TO SUPPRESS** |
| | : | (Hearing Requested) |
| Defendant. | : | |

Defendant Sirous Asgari, through counsel, respectfully moves this Court to suppress all evidence obtained in response to the February 26, 2013 and January 28, 2015 search warrants.[1] The search warrant affidavits are without probable cause. A memorandum in support of this Motion follows.

              Respectfully submitted,

              s/ STEPHEN C. NEWMAN
              Federal Public Defender
              Ohio Bar: 0051928
              s/ EDWARD G. BRYAN
              Assistant Federal Public Defender
              Ohio Bar: 0055556
              s/ CATHI ADINARO
              Attorney at Law
              Ohio Bar: 0088731
              1660 West Second Street, #750
              Cleveland, OH 44113
              (216)522-4856 Fax:(216)522-4321
              E-mail: stephen_newman@fd.org
              E-mail: edward_bryan@fd.org
              E-mail: cathi_adinaro@fd.org

              Counsel for Sirous Asgari

---

[1] The search warrants are being filed as an exhibit under seal because they purport to contain information on the alleged trade secret.

## **MEMORANDUM**

**I.     Dr. Asgari is both a respected and renowned materials science expert from Iran and a family man with significant ties to the United States.**

Dr. Sirous Asgari was born and raised in Iran. He first came to the United States in the mid-1990s with his family to study Materials Engineering. He received his Ph.D. from Drexel University in 1997. As part of his studies, Dr. Asgari became an expert in Transmission Electron Microscopy ("TEM"). After receiving his Ph.D., he returned to Iran and began teaching Materials Engineering at the university level. He has been a professor in the Department of Engineering and Material Science at Sharif University for sixteen years. His area of expertise remains TEM. As part of his professorship, he teaches classes and is responsible for mentoring Ph.D. and master's degree students in developing and defending their theses. This mentorship includes helping students conduct graduate level research and publish articles in academic and trade journals. Publication in academic and trade journals is important to any master's or Ph.D. student, but perhaps even more so to Iranian students, many of whom seek admission to European and American Ph.D. and post-doctoral programs. As Iranians, their academic credentials are closely scrutinized based on their record of publication.

Dr. Asgari and his wife have three children. Their oldest two children are citizens of Iran, but came to the United States to study; his son Mohammad at Stony Brook and then Columbia, and his daughter Zahra at Duke. They have both continued their residency in the United States post-graduation. Dr. Asgari's youngest child, a daughter, was born here in the United States while Dr. Asgari was studying at Drexel. She is therefore a United States citizen and carries a United States passport. While she is currently living in Iran and studying to be a pharmacist, she too is expected to come to the United States soon. In short, Dr. Asgari's ties to the United States are many and varied.

## II. Dr. Asgari's travel to the United States was significantly hampered by an overly-complex visa application process.

In April 2011, Dr. Asgari and his wife submitted applications for a tourist visa to visit the United States. This was their first trip to the United States in thirteen years, since Dr. Asgari's time at Drexel. The primary purpose of the trip was visit their son Mohammad at Stony Brook in New York. They intended to visit him during the summer of 2011. A trip over the summer was ideal because both Dr. Asgari and his wife are teachers and would be on summer break. However, due to the complex and convoluted nature of the visa application process for Iranian citizens, their visas were not approved until October 2011.

The process for an Iranian citizen to seek a visa to travel to the United States is lengthy and is premised on the absence of diplomatic relations between our two nations. One cannot simply visit the Embassy, local interest section, or Embassy branch office. In fact, travel to the United States from Iran requires the applicant to follow a rather byzantine process of on-line application, travel, and patience.

First, the applicant must submit an online application, a DS-160, to a United States Embassy via a third country U.S. Embassy. This is important, since once this form is completed there is no mechanism available to make changes. If your circumstances change, your sole option is to withdraw your application and start the process over again.

Weeks, sometimes months, later, the applicant is contacted, usually via email, for an interview. Since there is nowhere in Iran to conduct such an interview, this requires that the applicant travel to the United States Embassy where the electronic application was submitted at a time and date established by State Department personnel. Depending on the chosen country, this may take as much as a week—air travel in Iran is also complex. For example, a person travelling

to visit the United States Embassy in Tashkent, Uzbekistan, is constrained by the fact that there is only one flight into, and out of, Tashkent each week.

At this interview, the Iranian applicant is required to justify their proposed travel by providing supporting documentation, including documents supporting the reason for travel and demonstrating financial capacity to support the trip. Once again, the only option an applicant has if their circumstances change is to withdraw the application and start over. One can easily imagine how difficult this can be when planning a trip based around an academic calendar.

The interview process is followed by a security and background check. This is another potentially lengthy process which can extend anywhere from a month to a year. Once your application is approved, you have two choices: (a) surrender your passport to the issuing Embassy by mail and trust that it makes it back to you before your travel commences; or (b) take the once-per-week flight from your home nation to the Embassy to have your passport stamped. Again, there is no mechanism in place to allow for a change in circumstances other than starting the process over.

Because of these challenges, Dr. Asgari's visa was not approved in time to travel during the summer of 2011. He therefore made arraignments to travel in December to attend his son's graduation from Stony Brook. He attended his son's graduation in New York on December 22, 2011. Additionally, since submitting the application for his visa, his daughter (his second oldest) had been accepted into Duke. Dr. Asgari decided to travel to Chapel Hill, N.C. to help his daughter register for classes and settle in. This was entirely consistent with his stated purpose of visiting his child.

**III.    Dr. Asgari's 2011 travel to Cleveland was completely within the scope of his tourist visa and, given his relationship with Dr. Pirouz Pirouz of Case Western Reserve University, is in no way surprising or suspicious.**

While in the United States, Dr. Asgari also decided to make a trip to Cleveland to visit a colleague and friend, Dr. Pirouz Pirouz. At the time Dr. Pirouz was a professor in the Materials Science Engineering ("MSE") Department at Case Western Reserve University ("CWRU") (he has since retired and taken Emeritus status). Dr. Asgari and Dr. Pirouz had established a professional relationship in 2010. Dr. Pirouz had reached out to Dr. Asgari on a trip to Iran and asked for a tour of the MSE department at Sharif. Both were Iranian by birth; both were materials scientists; both were professors at leading universities in their field; both sought to publish; and both were family men. They had a lot in common.

Not surprisingly, when Dr. Pirouz travelled to Iran to visit family, he contacted Dr. Asgari. Dr. Asgari, in turn, invited Dr. Pirouz to visit him at Sharif University. After hosting Dr. Pirouz and his wife, their professional relationship developed into a personal friendship. This included an open, reciprocal, invitation from Dr. Pirouz for Dr. Asgari to visit him, both in terms of visiting his home in Cleveland and his lab at CWRU. So after his visa was approved, Dr. Asgari reached out to Dr. Pirouz about a possible visit. It is therefore true that this added trip to Cleveland was not part of Dr. Asgari's original travel plans. But in this context, it is in no way surprising or suspicious, nor representative of facts supporting probable cause to believe a crime has been committed, or that evidence of that crime will be found in the place or on the person to be searched.

**IV.    Dr. Asgari did perform TEM analysis of student samples during this period, but like any other qualified researcher, he did so at his own expense and on his own time.**

However, visiting Dr. Pirouz was not Dr. Asgari's only reason to visit CWRU. As a TEM specialist, the main tool of Dr. Asgari's trade is the TEM microscope. But following the fall semester at Sharif, Dr. Asgari's TEM was out of commission. This was creating significant

5

complications for his master's and Ph.D. students who needed to have samples analyzed by the TEM for their studies and theses.  Dr. Asgari therefore brought some of his student's samples with him to the United States in the hopes that, with Dr. Pirouz's help, he could gain access to the TEM at CWRU.

The Swagelok Center for Surface Analysis of Materials (SCSAM) at CWRU offers TEM equipment for trained users.[2]  SCSAM offers individuals access to a variety of instrumentation for the microstructural and compositional characterization of materials as well as surface and near-surface chemical analysis.  If the individual is trained on the equipment, he or she only needs to pay a fee to use the equipment to conduct independent research.  This is exactly what Dr. Asgari did—he paid a fee, out of his own pocket, to use the SCSAM equipment at CWRU to conduct an analysis on his students' TEM samples.

## V.        The February 26, 2013 Search Warrant lacks probable cause.

The February 2013 affidavit begins by making note of Dr. Asgari's purported "ties to the government of Iran ("GOI")."  The primary basis for this assertion is the fact that funding for Sharif University is provided by the GOI, certain aspects of state-run universities are "supervised" by the GOI, and that Sharif has performed research for the Iranian Navy.  Similarly, CWRU is funded in part by the United States Government, has aspects of its research "supervised" by various state and federal agencies, and has performed research for the United States Navy.  This is in no way surprising or suspicious.  Yet, apparently, because Dr. Asgari is an Iranian citizen the same facts, as found in the affidavit, purport to support probable cause that a crime has been committed, and that evidence of that crime will be found in the place or on the person to be searched.

---

[2] https://engineering.case.edu/centers/scsam/

Secondarily, the affidavit finds support from an article by a Sharif student on autonomous underwater vehicles. Sharif University maintains a small academic facility on Kish Island. It is true that a student from the Sharif University School of Technology, Department of Science and Technology, wrote a paper on autonomous underwater vehicles. Ignoring the tens of thousands of other papers published on autonomous underwater vehicles by individuals across the globe, and the fact that Dr. Asgari has no ties to this student, this department, nor the facility on Kish Island, there are a variety of uses for autonomous underwater vehicles, not the least of which is exploration for natural resources. In fact, the introduction to this particular paper states in pertinent part:

> [Mankind] is interested to explore the ocean as it has extreme natural sources which are not yet explored. Therefore in recent years, underwater exploration has experienced a substantial increase. As underwater survey is generally hazardous and costly, it is interested to design unmanned underwater vehicle (UUV) in most robotics and marine engineering active areas in order to reduce the cost and increase the reliability and safety of survey.

It is unclear if anyone actually read this article. The affidavit provides no explanation of how the underwater search for natural resources in the territorial waters of Iran supports probable cause, or how any of this is linked in any way to Dr. Asgari. Regardless, other than the fact that it is an Iranian article from an Iranian School by an Iranian student, and Dr. Asgari is an Iranian professor, these facts in no way contribute to a finding of probable cause that a crime has been committed or that evidence of that crime will be found in the place or on the person to be searched,.

The February 2013 affidavit goes on to indicate that SCSAM "contains advanced research instrumentation that is not available in Iran" and that Dr. Asgari conducted research without the Navy's approval or knowledge. This sentence is carefully, and misleadingly, phrased. TEM equipment is expensive and not readily available to general public. But it is commonly available in labs across the United States and Europe. It is, in fact, available in Iran. However, at that time

Dr. Asgari's TEM was broken—a fact known to the affiant, FBI Special Agent Timothy Boggs, at the time and no doubt the basis of his use of the adjective "available" in this context.  Moreover, the reason the TEM at Sharif was not working is more a matter of the impact of United States sanctions on the availability of parts than it is to the unique nature of the equipment.  Furthermore, the research Dr. Asgari conducted on his first trip to CWRU had nothing to do with CWRU, Swagelok, or the U.S. Navy.  He merely performed an analysis of samples prepared by his students in support of their studies at Sharif and paid for it out of his own pocket.  He used the lab as any other independent researcher would and paid the usage fee himself.  Again, these facts do not support the conclusion that there is probable cause to believe a crime has been committed, or that evidence of that crime will be found in the place or on the person to be searched.

    Yet the 2103 affidavit goes on to give the incorrect impression that SCSAM equipment is available only to persons with appropriate classification levels.  The affidavit asserts that SCSAM is "open to researchers who maybe working on projects with classification levels or projects that rely on classified information or technology."  Again, this is carefully parsed language, perhaps correct insofar as it pertains to persons working on classified projects.  However, not all work performed at SCSAM is classified, and the affidavit cites no evidence that Dr. Asgari had access to any classified research.  In fact, the evidence indicates that the lab is open to any independent researcher.  Neither Swagelok nor the Navy need approve an independent researcher who pays to use the lab.  It goes without saying that an independent researcher is unlikely to have clearance from the United States Navy.  The fact that Dr. Asgari was conducting independent research in SCSAM, a laboratory open to all qualified researchers, does not support a finding of probable cause that a crime was being committed, or that evidence of that crime would be found in the place or on the person to be searched.

While Dr. Asgari was in Cleveland, Dr. Pirouz asked him about collaborating on a research paper for a trade journal. Dr. Asgari agreed, subsequently returning to Iran on February 15, 2012. Even so, Dr. Asgari continued to communicate with Dr. Pirouz, mostly by email, about the research paper they had agreed to jointly publish. Dr. Reza Sharghi-Moshtaghin, a former Ph.D. student of Dr. Asgari's at Sharif, was also a part of this research collaboration. At this time, Dr. Sharghi-Moshtaghin a senior researcher at SCSAM. This collaborative research project was known to FBI SA Boggs and easily explains much of the email traffic cited as probable cause that a crime has been committed and that evidence of that crime is in the place or on the person to be searched. In short, Dr. Asgari's desire to publish an academic article in a philosophical journal was used as a basis to seize his email traffic.

In the affidavit, SA Boggs notes an interview of Arthur Heuer, the Director of SCSAM. In that interview, Dr. Heuer explained that Dr. Asgari had been working on a collaborative research project with a professor at CWRU prior to his arrival at CWRU in December of 2012. Because Dr. Asgari was collaborating on a research project with Dr. Pirouz, a CWRU professor in the MSE department, it is not at all suspicious that he would be emailing Dr. Pirouz and Dr. Sharghi-Moshtaghin prior to his arrival. Yet, the 2013 affidavit relies on these emails as probable cause to believe Dr. Asgari's true reason for visiting the United States was not to visit his children but to transfer technology back to Iran, in violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705(a). This conclusion is simply unsupported by the facts, even those known at the time the affidavit was prepared.

Dr. Asgari made his second trip to the United States in late 2012. For this trip, he submitted an application for a tourist visa on June 25, 2012. He was interviewed at the U.S. Embassy in Tashkent, Uzbekistan, on August 23, 2012. His visa was approved, and he picked it up on

9

September 24, 2012. At that time, he had no offer of employment from CWRU or any other agency, company, university or organization in the United States. He arrived in the United States on November 4, 2012. Approximately four or five days later, Dr. Pirouz contacted Dr. Asgari and informed him that there may be a job opening on a steel project at CWRU. He travelled to Cleveland for an interview. A few days later, Dr. Asgari was offered the position at CWRU on the condition that his visa could be changed to an H1B type visa. CWRU began working on Dr. Asgari's application for the H1B visa and Dr. Asgari began attending some required training.

On December 18, 2012, Dr. Asgari left Cleveland to travel with his daughter. This trip to Las Vegas and California had been planned prior to his arrival in the United States. When he returned to Cleveland in mid-January, he signed the H1B visa application and wrote a personal check for expedited processing. CWRU permitted Dr. Asgari to begin work on the research project while awaiting the approval of his H1B visa, which was expected shortly.

Despite being in the United States, Dr. Asgari still had obligations to his student mentees in Iran, many of whom were seeking letters of recommendation or feedback on their research. Dr. Asgari kept in touch with his students by email, online chatting software, and Dropbox. The 2013 affidavit concludes that because he was emailing students at Sharif University there is probable cause to believe his emails will show his "intention to export the results of his research and/or other technology to Iran." The fact that a professor is emailing his students is not probable cause that a crime is being committed. Moreover, at the time the affidavit was prepared Dr. Heuer told SA Boggs that the information Dr. Asgari had received while at CWRU "was not protected because it was all academic information and 'public domain.'"

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation...." U.S. CONST. amend. IV. The requirements of the Fourth

10

Amendment are clear: without probable cause, a judicial officer is without authority to issue a search warrant. *See Whitely v. Warden*, 401 U.S. 560, 564 (1971). To determine whether probable cause for a search exists, a judge issuing a warrant must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The facts set out in the 2013 affidavit do not support probable cause that Dr. Asgari made a materially false statement on his visitor's visa application.[3] On both occasions, Dr. Asgari travelled to the United States with the primary purpose of visiting his children and he, in fact, did visit his children. Additionally, the 2013 affidavit does not support a probable cause finding that Dr. Asgari committed a violation of IEEPA. The only factual support for this allegation is Dr. Asgari's emails to his students at Sharif University. If this were sufficient for a search warrant, the government would be given blanket approval to search the email accounts of every foreign-born visiting scholar or professor, perhaps every foreign visitor.[4] Because the 2013 affidavit is not supported by probable cause, Dr. Asgari's emails were obtained in violation of his Fourth Amendment rights and should be suppressed.

---

[3] Dr. Asgari does not concede the "facts" presented in the affidavit are accurate. However, for the purposes of this motion to suppress, even assuming these statements are accurate, the affidavit does not support a finding of probable cause.

[4] Several of the active "unusual and extraordinary threats" declared by the President under 50 U.S.C. § 1701 are Worldwide. Therefore, the government's ability to assert a violation of IEEPA is not limited and could cover any foreign visitor.

## VI.    The January 28, 2015 Search Warrant also lacks probable cause.

Based on the 2013 warrant, the government retrieved Dr. Asgari's emails. Yet no charges were filed against Dr. Asgari. On January 28, 2015, law enforcement sought another search warrant for Dr. Asgari's emails. The affidavit for this search warrant relies on information received in response to the 2013 search warrant. Therefore, the emails obtained in response to this second search warrant should be excluded as fruits of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963). Additionally, the 2015 application for the search warrant alleges there is probable cause to believe a violation of 18 U.S.C. § 1001(a)(2) (false statements to a federal agent) and 50 U.S.C. § 1705(a) (IEEPA) will be found in his emails.[5] The affidavit in support of the warrant, however, does not allege IEEPA. Instead, it alleges that Dr. Asgari's emails will show a violation of theft of trade secrets and visa fraud. Despite this glaring inconsistency, the search warrant was erroneously issued by the magistrate judge.

The 2015 affidavit, similar to the first, asserts that because Dr. Asgari was communicating with students at Sharif University while he was at CWRU there is evidence he was transferring trade secrets. This again ignores the fact that Dr. Asgari was a professor at Sharif. He was still working with master's and Ph.D. students on their theses. Dr. Asgari's area of expertise, and one he was teaching, is TEM. Therefore, the fact that he sent emails to Sharif students about TEM, is evidence of a professor communicating with his students.

The government references a chat between Dr. Asgari and one of his students at Sharif about shipping physical TEM samples. The paragraph in the affidavit is an affirmative misrepresentation of that conversation. In that conversation, Dr. Asgari does not seek to send samples from the United States to Iran. Instead, *the Iranian student is asking if she could send*

---

[5] This is identical to the 2013 application for a search warrant.

12

*TEM samples to him* for testing.  These are not Swagelok TEM samples; they are not U.S. Navy samples; nor are they CWRU-created TEM samples.  They are, in fact, samples created by Dr. Asgari's students in Iran that they hope can be analyzed by their professor who has access to a functional TEM.  In fact, Dr. Asgari *needs* to test these samples.  It is his responsibility to review the work of his students in order to determine whether the students have mastered the technique necessary to grant them the credentials they seek.  Ultimately, Dr. Asgari elected to advise his student *not* to send the samples.  A correct translation of this chat indicates that he told his student that he would simply retrieve the samples upon his return to Iran and bring them back with him when he came back to the United States.  He made this decision because, as the chat clearly indicates, he was concerned that to send them may break United States law.  Yet the affidavit purports to use this as evidence to support probable cause that he *violated* the law.  To be clear— evidence that Dr. Asgari neither solicited nor sought to send samples from the United States to Iran is *not* probable cause.  These communications between Dr. Asgari and students at Sharif do not support a conclusion that a crime has been committed, nor that there is evidence to be found in the place or on the person to be searched.

    Dr. Asgari's emails obtained in response to the 2015 search warrant should be suppressed based on the fruits of the poisonous tree doctrine and because the affidavit does not set forth sufficient facts to find probable cause a crime has been committed.

                                Respectfully submitted,

                                  s/ STEPHEN C. NEWMAN
                                Federal Public Defender
                                Ohio Bar:  0051928
                                s/ EDWARD G. BRYAN
                                Assistant Federal Public Defender
                                Ohio Bar: 0055556
                                s/ CATHI ADINARO
                                Attorney at Law

Ohio Bar: 0088731
1660 West Second Street, #750
Cleveland, OH 44113
(216)522-4856 Fax:(216)522-4321
E-mail: stephen_newman@fd.org
E-mail: edward_bryan@fd.org
E-mail: cathi_adinaro@fd.org

Counsel for Sirous Asgari

Case: 1:16-cr-00124-JG Doc #: 67 Filed: 01/22/18 14 of 15. PageID #: 333

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2018, a copy of the foregoing Motion was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by email. Parties may access this filing through the Court's system.

s/ STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar:  0051928
