IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:16CR124 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | |
| SIROUS ASGARI, | ) | <u>UNITED STATES' TRIAL BRIEF</u> |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its counsel, Justin E. Herdman, United States Attorney, and Daniel J. Riedl and Om M. Kakani, Assistant United States Attorneys, and William A. Mackie, Trial Attorney, National Security Division, Department of Justice, respectfully submits the following trial brief in anticipation of the April 9, 2018, jury trial of Defendant Sirous Asgari.

<h1 style="text-align:center">Table of Contents</h1>

I.     OVERVIEW OF THE CASE ...................................................................................3
      A.     CHARGES AS SET FORTH IN THE INDICTMENT ...........................................3
      B.     STATEMENT OF FACTS/GOVERNMENT'S THEORY OF THE CASE..........3
           1.     Background on Defendant .......................................................................3
           2.     Asgari's Visa Fraud .............................................................................3
           3.     Asgari's Wire Fraud and Theft of Swagelok Trade Secrets .....................6
II.    CONTROLLING LAW ........................................................................................9
      A.     TITLE 18, UNITED STATES CODE, SECTION 1832(A)(1); THEFT OF TRADE SECRETS ..............................................................................................9
           1.     Statutory Language .................................................................................9
           2.     Elements................................................................................................10
      B.     TITLE 18, UNITED STATES CODE, SECTION 1343; WIRE FRAUD............10
           1.     Statutory Language ...............................................................................10
           2.     Elements................................................................................................10
      C.     TITLE 18, UNITED STATES CODE, SECTION 1546(A); VISA FRAUD .......11
           1.     Statutory Language ...............................................................................11
           2.     Elements................................................................................................11
III.   STIPULATIONS .................................................................................................12
IV.   ANTICIPATED LEGAL/EVIDENTIARY ISSUES .......................................12
      A.     DEFENDANT SHOULD BE PROHIBITED FROM INTRODUCING EVIDENCE ABOUT THE LAW ....................................................................12
      B.     DISCUSSIONS OF PATENT LAW SHOULD BE LIMITED .........................20
           1.     The "Best-Mode" Obligation is Temporally Limited ..............................20
           2.     The Parties and the Court Misunderstood Swagelok's Patented Process..23
           3.     Conclusion ............................................................................................26
      C.     DEFENDANT MAY NOT SEEK TO ADMIT HIS OWN SELF-SERVING OUT-OF-COURT STATEMENTS ...................................................................26
      D.     AUTHENTICATION OF BUSINESS RECORDS – RULE 902(11) AND 902(13) ...........................................................................................................27
      E.     SUMMARY/DEMONSTRATIVE EXHIBITS ..................................................28
      F.     HYBRID WITNESSES......................................................................................30
      G.     PRESENCE OF WITNESSES AT CERTAIN STAGES ..................................32
      H.     PRESENTATION OF RESTRICTED/PROTECTED TRADE SECRETS AT TRIAL ..............................................................................................................33
      I.     CHARACTER EVIDENCE/GOOD GUY EVIDENCE ...................................34
           1.     Good Acts Evidence is Irrelevant and Inadmissible ...............................34
           2.     Defendant's Methods for Proving Character ...........................................35
           3.     Defendant Should be Required to Give Advance Notice of Any "Good Acts" Evidence He Intends to Offer....................................................36
           4.     Rebutting the Defendant's Character Evidence. ....................................38
V.     TRIAL DOCUMENTS........................................................................................39
VI.   ESTIMATED LENGTH OF TRIAL.................................................................39
VII.   CONCLUSION ...................................................................................................40

I.    **OVERVIEW OF THE CASE**

    A.    **CHARGES AS SET FORTH IN THE INDICTMENT**

The Indictment charges Defendant Sirous Asgari with the following offenses:

    Count 1:                Theft of Trade Secrets (18 U.S.C. § 1832(1))

    Counts 2 – 12:        Wire Fraud (18 U.S.C. § 1343)

    Count 13:            Visa Fraud (18 U.S.C. § 1546(a))

    B.    **STATEMENT OF FACTS/GOVERNMENT'S THEORY OF THE CASE**

        1.    **Background on Defendant**

Defendant Asgari is an Iranian citizen and professor in the Department of Materials

Science and Engineering at Sharif University in Iran.  He was educated in Iran before traveling

to the United States where he received a Ph.D. from Drexel University in 1997.  Asgari made

two trips to the United States that are relevant to this case:  one from December 11, 2011, to

February 15, 2012; and another from November 4, 2012, to April 30, 2013.

        On his first trip, Asgari entered the U.S. on a B-2 tourist Visa on or about December 12,

2011.  Asgari departed the United States on February 15, 2012.  In his Department of State,

Bureau of Consular Affairs, Non Immigrant Visa (NIV) Applicant Detail, Asgari reported he

planned to travel to the United States to visit his children.  The locations to be visited were listed

as New York, Pennsylvania, Florida, and Los Angeles, California.  In his visa documentation,

Asgari did not disclose any plans to visit Case Western Reserve University (CWRU) in

Cleveland, Ohio.  However, during this trip, Asgari traveled to CWRU and met with faculty

there.

        2.    **Asgari's Visa Fraud**

        Shortly after returning to Iran, Asgari began making plans to return to the United States

to pursue research, employment and a yearlong sabbatical at CWRU.  Starting in March 2012

3

Asgari communicated via sirousasgari@gmail.com with Pirouz Pirouz (hereinafter, Pirouz), Professor, Department of Materials Science and Engineering, CWRU, and requested Pirouz write a letter of invitation and a letter of recommendation from CWRU.  Asgari requested these letters to obtain approval to leave Sharif University for a one-year sabbatical for research at CWRU. On or about April 3, 2012, at Asgari's request, Pirouz provided him with a memorandum on CWRU letterhead inviting him to spend his sabbatical leave at CWRU.  On April 12, 2012, again at Asgari's request, Pirouz gave him a letter of recommendation also written on CWRU letterhead.  After Asgari obtained approval from Sharif to begin a one-year sabbatical at CWRU, he informed Pirouz of the same.  Pirouz then placed Asgari on notice that he would need to complete a "J1" Visa Application in order to enter the United States for his sabbatical research. Pirouz further provided Asgari with a copy of the CWRU standard J1 Visa information sheet and provided Asgari with the CWRU email address where he should send the completed form.

After receiving the CWRU sabbatical invitation in April 2012 and the J1 Visa information, and obtaining information to present to his employer to be approved for a year-long sabbatical in the United States, in or around June 2012 Asgari began the application process for obtaining another visa to the United States.  However, instead of applying for the J1 Visa, Asgari again applied for a B1/B2 Tourist Visa.  In his application, Asgari failed to disclose that he was coming to the United States to work or conduct research at CWRU.  He falsely stated that he would be in the United States for only three months and listed his destination as his son's residence in New York.  In his Non Immigrant Visa Applicant Detail, Asgari reported that he planned to travel to the United States to visit his children.  Asgari did not make any reference in his immigration visa application to any plans to visit CWRU for any extended time, to work or conduct research at CWRU, or to any intention to obtain technology to export to Iran.  On or

4

about August 23, 2012, Asgari participated in a follow-up interview with a U.S. Department of State (DoS) consular official regarding the issuance of his Tourist Visa, at which time he confirmed that he only sought to be a tourist and failed to disclose that he would come work or conduct research at CWRU for his sabbatical year. Asgari was eventually issued a B-1/B-2 visa authorizing him to visit the United States. Although this visa would permit a person enter the United States to conduct business or attend a scientific conference, it does not authorize the holder to work in the United States, go to school, or to conduct research that benefits a U.S. institution, and is limited to stays of no longer than three months.

Based upon the above misrepresentations and omissions, Asgari received a Tourist B1/B2 Visa on or about September 24, 2012. To obtain his Tourist Visa, Asgari had to fly from Tehran to a U.S. consular office in Tashkent, Uzbekistan. In the days leading up to his visit to the Tashkent consular office to obtain his Tourist Visa, Asgari continued to discuss job opportunities with Pirouz. Within ten days after receiving his Tourist Visa, but before he entered the United States, Asgari drafted and eventually sent a job application to another CWRU professor. At no time did Asgari update his visa application to reflect his attempts to gain employment while in the United States.

Asgari entered the United States on a B-1/B-2 Tourist Visa on November 4, 2012. On November 10, 2012, six days after arriving in the United States, Asgari arrived in Cleveland. By November 15, 2012, he had received a CWRU employee ID with access to restricted areas. Before the end of the month he would also be given an office, employee parking privileges and a CWRU email address. On November 21, 2012, he signed the Swagelok Nondisclosure Agreement (NDA) and began work on the Navy project at the CWRU Swagelok Center for Surface Analysis of Materials ("Swagelok Center"), a laboratory located at CWRU. Asgari was

to prepare Transition Electron Microscopy (TEM) samples of various grades of stainless steels that had been treated using Swagelok's SAT12 Low Temperature Carburization process.  The examination of these samples would be used to study the effects of Low Temperature Carburization for various applications by the US Navy.  Not only did Asgari make false statements to obtain a tourist visa and gain entry into the country, once he was in the country and began doing work that was incompatible with the visa he held, Asgari did not promptly seek to change or amend his visa.

3.     Asgari's Wire Fraud and Theft of Swagelok Trade Secrets

The Swagelok Center is located at CWRU and is a joint venture between CWRU and the Swagelok Corporation ("Swagelok").  Swagelok is located in Solon, Ohio, and manufactures products used in the alternative fuels, chemical, petrochemical, oil, gas, and energy industries. Among the products are high-strength fasteners for pipes.  Swagelok does business in over 70 different countries.  As part of the collaboration at the Swagelok Center, Swagelok and CWRU entered into a formal agreement to protect proprietary information shared with CWRU for research.  Swagelok also retained the right to review any articles based on research involving Swagelok prior to publication and to review any presentations involving low temperature carburization before they were given.  Researchers working on joint Swagelok/CWRU projects were required to sign a non-disclosure agreement ("NDA") with Swagelok.  Asgari, as a researcher/employee in the Swagelok Center working on specific Swagelok projects, signed an NDA before he could access Swagelok proprietary and trade secret information.

At the time that Asgari arrived at the Swagelok Center, a project was underway that was being funded by the Office of Naval Research.  This project involved collaboration between Swagelok and CWRU to research improvements and further applications for a process used by

6

Swagelok to improve the hardness and strength of metals while simultaneously improving their corrosion and erosion resistance.  Swagelok advertises this process as the "SAT12 process," which is a commercial name for the low temperature carburization of stainless steel.  Swagelok holds multiple patents involving low temperature carburization and has a large research and development team working to discover improvements to the process.  Some of these discoveries are protected by Swagelok as trade secrets while others are included in subsequent patents.  The ability to improve the strength, hardness, corrosion resistance and erosion resistance properties of metals while keeping the original product dimensions and ductility has applications in numerous fields, including military and nuclear applications.  While Swagelok holds multiple patents in low temperature carburization, much of the data underlying the SAT12 process and the research and development into improvements to the SAT12 process are kept as trade secrets.  During the time Asgari was at CWRU, Swagelok was developing a process for soft vacuum low temperature carburization.  Swagelok had obtained a patent for this process but was continuing research to improve the efficiency of the process and to learn whether the process could be consistently applied to other stainless steels.  The Swagelok process cost Swagelok millions of dollars to develop, with additional millions in research grants spent characterizing the process at the Swagelok Center.

In addition to its trade secrets, Swagelok protects proprietary information.  This information is protected by physical and electronic safeguards as well as by NDAs signed by CWRU students and employees as well as Swagelok's suppliers and customers.  Swagelok takes measures to protect the data related to this process and views its ability to reliably reproduce the SAT12 process in a large-scale commercial setting as important to its competitive edge.  The research being conducted by Swagelok includes research into ways to shorten the SAT12

7

process, which could lead to great cost-savings.  After arriving at CWRU and signing the NDA,
Asgari began work on the Navy project and obtained trade secret and proprietary data involving
improvements to Swagelok's SAT12 process.

All employees or students of CWRU working on the Navy project were required to sign
the NDA prior to beginning work and gaining access to any Swagelok information.  Asgari
signed the NDA on November 21, 2012.  The agreement required that Asgari "hold all of the
data and information provided in strict confidence."  In the agreement, Asgari acknowledged that
"much of the material obtained or to be obtained from Swagelok or from third parties on behalf
of Swagelok, the disclosure of which to, or use by, third parties could be damaging
('Confidential Information')."  Further the agreement defined "Confidential Information" to
include "trade secrets, design documents, drawings, prints, know-how specifications, flowcharts,
worksheets, data, reports, software, whether in human-readable or machine-readable form,
documentation, correspondence, and information concerning its products, designs, and
manufacturing processes, distribution, finances, sales and purchasing practices, and personnel in
any form, originated by, licensed to, or prepared for Swagelok."  Asgari agreed "not to make any
use of the Confidential Information except in furtherance of [his] business with Swagelok, nor
disclose the Confidential Information to any third party without written consent of Swagelok."
The agreement further stated that all Confidential Information belonged "exclusively to
Swagelok."  Had Asgari not signed the non-disclosure agreement, he would not have been able
to gain access to information from Swagelok related to the Navy project or the SAT12 process.

While working at the Swagelok Center, Asgari was provided CWRU email account
sxa475@case.edu.  CWRU's email system uses Google servers in California.  While working at
the Swagelok Center, Asgari used his CWRU email account to communicate with Swagelok

8

employees about the Navy project and to request information about the SAT12 process.  At the same time, Asgari continued to use his personal Gmail email account to communicate with individuals in Iran.  Asgari also obtained physical samples of metals that had been treated with the SAT12 process.

Over the course of the next several months, Asgari accumulated data concerning proprietary Swagelok processes and information, including trade secrets used by Swagelok in their processes, many of which were discovered after Swagelok first filed its patents.  Under the terms of the NDA, Asgari was permitted access to these materials provided he did not retain them, or disclose them to other third parties.  Asgari did not abide by those terms.  Instead, on numerous occasions he forwarded confidential, proprietary and trade secret information from Swagelok to his personal Gmail account, and then on to students in Iran.  The information he provided was then later used in an economic proposal for the petrochemical industry in Iran, which touted Asgari's acquisition of technology theretofore only possessed by a United States company.

## II.    CONTROLLING LAW

### A.    TITLE 18, UNITED STATES CODE, SECTION 1832(A)(1); THEFT OF TRADE SECRETS

#### 1.    Statutory Language

Title 18, United States Code, Section 1832(a)(1) provides:

> Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly--
>
> > (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

9

****

Shall be fined under this title or imprisoned not more than 10 years, or both.

2.    Elements

The elements of Theft of Trade Secrets are:

1.  First, the Defendant intended to convert a trade secret to the economic benefit of anyone other than the owner;

2.  Second, the materials at issue contained trade secret information;

3.  Third, the Defendant knowingly stole, or without authorization appropriated, took, carried away, or concealed the trade secret information;

4.  Fourth, the Defendant intended, or knew, the offense would injure the owner of the trade secret information; and

5.  Fifth, the trade secret information was related to or included in a product that is produced for or placed in interstate or foreign commerce.

B.    TITLE 18, UNITED STATES CODE, SECTION 1343; WIRE FRAUD

1.    Statutory Language

Title 18, United States Code, Section 1343 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

2.    Elements

The elements of Wire Fraud are:

1.  First, that the defendant devised a scheme to defraud in order to obtain money or property;

2.  Second, that the scheme included a material misrepresentation or concealment of a material fact;

10

3.  Third, the Defendant had the intent to defraud; and

4.  Fourth, that the Defendant used wire, radio, or television communications in interstate or foreign commerce in furtherance of the scheme.

C.  <u>TITLE 18, UNITED STATES CODE, SECTION 1546(A); VISA FRAUD</u>

1.  <u>Statutory Language</u>

Title 18, United States Code, Section 1546(a) provides:

(a) Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained

****

Shall be fined under this title or imprisoned not more than … 10 years … or both.

2.  <u>Elements</u>

The elements of Visa Fraud are:

1.  First, the Defendant knowingly used, attempted to use, possessed, obtained, accepted, or received a nonimmigrant visa;

2.  Second, the nonimmigrant visa was procured by means of a false claim or statement, otherwise procured by fraud, or unlawfully obtained;

3.  Third, the Defendant knew the nonimmigrant visa to have been procured by means of a false claim or statement, otherwise procured by fraud or unlawfully obtained; and

4.  Fourth, that the false claim or statement was material.

11

III.  **STIPULATIONS**

The government has proposed various stipulations in order to ensure the trial proceeds as efficiently as possible.  These include stipulations:

1.  To the authenticity of the CWRU emails.

2.  That the Gmail and CWRU emails traveled via interstate wire.

3.  That the government's translations are accurate.

4.  That the government's transcriptions of the audio clip and video clip are accurate.

At the time of this filing, the government has not received a response to its proposed stipulations.  If the defense does not agree to these stipulations, the government is prepared to call additional witnesses to address these matters.

IV.  **ANTICIPATED LEGAL/EVIDENTIARY ISSUES**

A.  DEFENDANT SHOULD BE PROHIBITED FROM INTRODUCING EVIDENCE ABOUT THE LAW

Defendant should be prohibited from introducing evidence or testimony concerning patent or immigration *law* in this matter.  Discussion of such law is both confusing and intrudes on the province of the jury as the ultimate fact-finder.  Evidence in the form of testimony or exhibits discussing statutes, legal treatises, case law, internet postings and documents that include citations to the law or that attempt to interpret the law should be excluded from evidence in this case.  Introduction of such evidence through documents or witnesses would invade the province of the court to instruct the jury regarding the law. See, e.g., United States v. Poschwatta, 829 F.2d 1477, 1483 (9th Cir. 1987) ("The court acts as the jury's sole source of the law.").

12

It is well established that "it is the district court's peculiar province to instruct the jury on the law . . . ." United States v. Mann, 884 F.2d 532, 538 (10th Cir. 1989). As one court has explained:

> The law is given to the jury by the court and not introduced as evidence. . . . Obviously, it would be most confusing to a jury to have legal material introduced as evidence and then argued as to what the law is or ought to be." The law is the singular province of the judge. Juries only decide facts, to which they apply the law given to them by the judge. They may not decide what the law is and should not be given the opportunity to do so.

United States v. Willie, 941 F.2d 1384, 1396 (10th Cir. 1992) (quoting Cooley v. United States, 501 F.2d 1249, 1253-54 (9th Cir. 1974)) (excluded portions of Congressional Record, IRS Training Manual and Supreme Court opinions) (internal citations omitted).  The court acts as a jury's sole source of the law. See also United States v. Garber, 589 F.2d 843, 849 (5th Cir. 1979) ("In our judicial system the court instructs the jury on the applicable law, and directs the jury to determine the facts from the evidence and to apply the law as given by the court to those facts."). The Court should determine the applicable law and so instruct the jury. "It is within the sole province of the court 'to determine the applicable law and to instruct the jury as to that law.'" United States v. Hill, 167 F.3d 1055, 1069 (6th Cir. 1999) (quoting In re Air Crash Disaster, 86 F.3d 498, 523 (6th Cir. 1996); see also Mann, 884 F.2d at 538 ("It is the district court's peculiar province to instruct the jury on the law . . . .").

Accordingly, federal appellate courts have repeatedly upheld decisions by district courts refusing to admit legal and pseudo-legal arguments offered by defendants in criminal trials. See, e.g., United States v. Stafford, 983 F.2d 25, 27 (5th Cir. 1993) (trial court properly refused to admit court cases); United States v. Payne, 978 F.2d 1177, 1182 (10th Cir. 1992) (refusing to admit federal court decision, copies of the Internal Revenue Code ("IRC"), or defendant's legal research notes); United States v. Barnett, 945 F.2d 1296, 1301 n.2 (5th Cir. 1991) (trial court

13

acted properly in excluding multiple volumes of the IRC, the United States Constitution, an IRS Privacy Notice Act, the Black's Law Dictionary definition of "income", the Texas State Constitution, and an IRS handbook for special agents); Willie, 941 F.2d 1384, 1391-97 & n.11 (10th Cir. 1992) (trial court properly refused to admit the U.S. Constitution, legal decisions, or other historical materials); United States v. Fingado, 934 F.2d 1163, 1164 (10th Cir. 1991) (refusing to allow defendant to testify about a civil court case on which he ostensibly relied in forming his views about the tax laws); United States v. Flitcraft, 803 F.2d 184, 185-186 (5th Cir. 1986); United States v. Kraeger, 711 F.2d 6, 7-8 (2d Cir. 1983) (excluding federal court decisions proffered by a tax protester); Cooley, 501 F.2d 1249, 1253-54 (9th Cir. 1974) (refusing to admit U.S. Supreme Court decisions, IRS training manual, and materials from the Congressional Record).

Based on conversations with defense counsel and their retention of immigration and patent attorneys as experts, the government anticipates that Defendant will attempt to inject legal opinions on immigration and patent law into this matter as a means of jury nullification by arguing that in their experts' legal opinions: a) Defendant did not legally commit Visa Fraud due to his expert's interpretation of the Immigration and Naturalization Act; b) the victim company somehow failed to meet its "duty of candor" in establishing the "best mode" for its process; or c) the patent attorney believes the trade secret matter is not legally a trade secret. The first category may be proper for legal argument before an Immigration Judge, and the latter two categories may be appropriate in a legal argument before a judge in a patent infringement matter. However, Defendant is charged with Trade Secret Theft and Wire and Visa Fraud and factual issues as to whether he committed such offenses should be left to the province of the finder of fact. Legal opinions and opinions based upon an attorney's legal training and experience are otherwise

14

inappropriate in this case and invade on the Court's sovereignty in establishing the law in this matter.

It is a fundamental precept that expert testimony on the meaning and applicability of relevant law is inadmissible.  That is because each trial court already has its own legal expert: the judge.  See, e.g., United States v. Wilson, 133 F.3d 251, 265 (4th Cir. 1997); Adalman v. Baker, Watts, & Co., 807 F.2d 359, 366-68 (4th Cir. 1986) (abrogated on other grounds) ("expert" testimony of lawyer about meaning and applicability of securities laws inadmissible as the province of the judge")); Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99-100 (1st Cir. 1997) (collecting cases); In re: Initial Public Offering Securities Litigation, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (abrogated in part on other grounds) (finding that "every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law" and reciting cases in support of the same).

"It is the function of the trial judge to determine the law of the case.  It is impermissible to delegate that function to a jury through the submission of testimony on controlling legal principles."  United States v. Zipkin, 729 F.2d 384, 387 (6th Cir. 1984).  An expert who offers legal conclusions usurps not only the judge's duty to set forth the law but also the jury's duty to apply this law to the evidence.  Fed R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone").  Time and again, the Sixth Circuit and other circuit courts have affirmed a trial court's decision to exclude the testimony of purported "experts" espousing legal conclusions or conclusions about how the law should apply to particular facts.  Id.; Shahid v. Detroit, 889 F.2d 1543, 1547 (6th Cir. 1989) (affirming exclusion of expert witness who intruded upon the

purview of the judge); United States v. Scholl, 166 F.3d 964, 973 (9th Cir. 1999) (testimony by

experts on tax and accounting laws that such laws were confusing and that defendant was

reasonable in his belief that he could net out gambling wins and losses properly excluded);

Adalman, 807 F.2d at 368 (affirming exclusion of proposed expert witness who would "testify in

substantial part to the meaning and applicability of the securities laws to the transactions here,

giving his expert opinion on the governing law"); Estate of Sowell v. United States, 98 F.3d 169,

171-72 (5th Cir. 1999) (testimony by law school dean about what actions would be reasonable

for hypothetical estate executor to take, when faced with same facts as in case at bar, properly

excluded); Snap-Drape, Inc. v. Commissioner of Internal Revenue, 98 F.3d 194, 198 (5th Cir.

1996) (testimony by two certified public accountants about whether certain dividends are

deductible under the Internal Revenue Code in calculating "adjusted current earnings" for

purposes of the corporate alternative minimum tax properly excluded); Farmland Indus. v.

Frazier-Parrot Commodities, Inc., 871 F.2d 1402, 1409 (8th Cir. 1989) (testimony by defense

expert on whether requirements of commodities regulations had been met properly excluded).

     Nor does Federal Rule 704 provide an exception to the well-established rule that expert

testimony offering legal conclusions is inadmissible.  While Rule 704 allows for the admission

of opinion testimony on the ultimate issue of fact, it does not absolve of party of the requirement

that the testimony must be "otherwise admissible:"

> Rule [704(a)], however, does not lower the bars so as to admit all opinions.  As a
> condition to admissibility under Rule 704(a), **testimony on ultimate issues must
> be otherwise admissible under the Rules of Evidence**.  Therefore, although
> opinion testimony that embraces an ultimate issue cannot be excluded under Rule
> 704(a), it may be excludable on other grounds.

United States v. Barile, 286 F.3d 749, 759 (4th Cir. 2002) (citations omitted) (emphasis added);

Fed. R. Evid. 704.  Legal conclusions or testimony that a law is confusing is never admissible.

United States v. Curtis, 782 F.2d 593, 599 (6th Cir. 1986).

To be admissible under Rule 702, expert testimony must "assist the trier of fact to

understand the evidence or determine a fact in issue."  Expert opinion testimony that provides

legal conclusions is properly excludable on these grounds alone, because it is not only unhelpful

to the jury but will inevitably lead to the jury being confused and misled.  Curtis, 782 F.2d at 599

(an expert witness offering opinions on legal questions would lead to the jury being "confused by

opposing opinions of law offered by different experts").  "Expert testimony that testifies about

what the law is or directs the finder of fact how to apply law to facts does not assist the trier of

fact to understand the evidence or to determine a fact in issue within the contemplation of Fed.

R. Evid. 702."  Stobie Creek Investments v. United States, 81 Fed. Cl. 358, 360-61 (Fed. Cl.

2008) (internal quotation and citation omitted).  For that reason, "[e]xpert testimony that

amounts to an opinion of law is especially disfavored."  Id.  Courts have frequently found that

the sheer risk that an expert could infect a jury with their own view of the law and thus usurp the

judge's authority is sufficient to bar their testimony:

> In a case involving the application of complex regulations, like this one, it can be
> difficult for factual witnesses who are also the individuals responsible for
> enforcing the regulations to testify without at least referencing the legal
> framework which motivated and justified their activities.  It can likewise be
> difficult for the trial court to preserve to itself the exclusive task of instructing the
> jury on the law while, at the same time, allowing expert witnesses to state their
> findings and to give their opinions on relevant questions.

Wilson, 133 F.3d at 265 (affirming district court's decision excluding expert testimony of two

former state Assistant Attorneys General about the Clean Water Act); Adalman, 807 F.2d at 368

(affirming district court's decision excluding expert testimony of law professor regarding

securities laws in part because of "the difficulty of drawing the appropriate line" between their factual testimony about the law and inferring any legal conclusions).

Since Defendant has not yet complied[1] with his discovery obligations and provided the government with a summary of his proposed expert's testimony, the government is left to guess what a patent attorney and immigration attorney would testify to in a Trade Secret and Wire and Visa Fraud.  However, logic would suggest that their testimony would touch upon what the law is and that the immigration and trade secret laws are too complex for Defendant to understand or navigate.  See (R. 67: Motion to Suppress, PageID 320, 322-25 (alternatively alleging the visa application process was either "overly-complex," "complex and convoluted," and "rather byzantine," or that all of Defendant's travel in 2011 was within the scope of the "byzantine" system)) and (R. 101: Motion to Waive Jury Trial, PageID 1162, 1165 (alleging that the trade secrets will be "overly technical and complex").  The Sixth Circuit has directly addressed this exact type of expert testimony and found that it is improper and should be excluded.  In United States v. Curtis, the Sixth Circuit considered the trial court's exclusion of a defendants' proposed expert witness.  782 F.2d at 598.  The expert witness would have testified that the relevant area of tax law was complex and that the defendant may have been confused.  The Sixth Circuit affirmed the exclusion of the expert witness.  First, it found the proposed testimony to be

---

[1] The government provided Rule 16 discovery starting August 15, 2017.  In its discovery letter, the government noted that "the government's substantial compliance with the defendant's proper discovery requests now triggers defendant's obligation to provide reciprocal discovery. Accordingly, the government hereby requests reciprocal discovery pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure."  Subsequent discovery letters included the same language. As of this filing, Defendant has provided CVs for Attorney Robert Brown, an immigration lawyer, Attorney Joshua Goldberg, a patent attorney, and Dr. Gerald Frankel, a college Professor, but has not received expert summaries for these witnesses as required by Rule 16(b)(1)(C).

irrelevant.  As the court noted, "[w]illfulness is personal.  It relates to the defendant's state of mind.  It does not exist in the abstract.  Unless there is a connection between the external facts and the defendant's state of mind, the evidence of the external facts is not relevant."  Id. at 599.  Second, it is improper for an expert to "testify about the law because the judge's special legal knowledge is presumed to be sufficient, and it is the judge's duty to inform the jury about the law that is relevant to their deliberations."  Id.  Third, "[j]urors might be confused by opposing opinions of law" and expert testimony on whether the law is complex or confusing would "force jurors into tak[ing] their instructions on the law from expert witnesses as well as from the trial judge."  Id. at 600.  "Finally, and perhaps most significantly," an expert testifying on whether the law is complex or confusing,

> requires the jury to assume part of the judge's responsibility to rule on questions of law.  [This approach] asks the jury to read and interpret statutes to determine whether or not the governing law is uncertain or debatable.  This function has traditionally belonged to the judge, as [] the jury is not composed of lawyers; the typical juror is untrained in legal affairs.  To attempt to explain the myriad rules of judicial construction, the complexity of legal principles, or the function of precedent would hopelessly divert the jury from their preeminent duty of assessing appellant's guilt.

Id. (citations omitted); see also United States v. Fowler, 932 F.2d 306, 315 (4th Cir. 1991) (affirming exclusion of expert testimony on whether certain regulations were confusing as expert witness lacked foundation to testify about a defendant's state of mind – "expert witnesses could not testify that [defendant] was confused" – and that Rule 704(b) would bar such testimony); Scholl, 166 F.3d at 973 (9th Cir. 1999) (affirming exclusion of proposed expert testimony that tax and accounting laws were confusing and that defendants' interpretation therefore could be reasonable as "call[ing] for a legal conclusion").  There is no legal basis to allow this testimony to be heard by the jury.  This Court should therefore exclude it.

B.     DISCUSSIONS OF PATENT LAW SHOULD BE LIMITED

Because the requirements to file a ***patent*** are both technical and irrelevant to the instant proceedings, testimony and questions about ***patent law*** should be limited.  The government does not suggest that defendant cannot ask questions about the underlying facts and processes disclosed to the public in a patent, as such material may be relevant to whether a trade secret was properly guarded by the victim.  However, discussions into the legal and technical requirements to file and obtain a patent are irrelevant, confusing and more prejudicial than probative.  As discussed below, such lines of questioning can confuse spectators and participants alike.

1.     The "Best-Mode" Obligation is Temporally Limited

The filing and publication of a patent does not prohibit an inventor from later developing new techniques and processes, which can be held as trade secrets.  In fact a patent applicant is statutorily prohibited from inserting "new matter," that is, newly developed "best modes" into existing patent applications.  See 35 U.S.C. § 132.

The determination as to whether the best mode requirement has been satisfied is a question of fact. Spectra–Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1535–36, 3 USPQ2d 1737, 1745 (Fed. Cir.), cert. denied, 484 U.S. 954, 108 S. Ct. 346, 98 L.Ed.2d 372 (1987); McGill Inc. v. John Zink Co., 736 F.2d 666, 676, 221 USPQ 944, 951 (Fed. Cir.), cert. denied, 469 U.S. 1037, 105 S. Ct. 514, 83 L.Ed.2d 404 (1984). The purpose of the best mode requirement is to "restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their invention which they have in fact conceived." In re Gay, 309 F.2d 769, 772, 135 USPQ 311, 315 (CCPA 1962). A holding of invalidity for failure to disclose the best mode requires clear and convincing evidence that the inventor both knew of and concealed a better mode of carrying out the claimed invention than was set forth in the

specification. Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1578, 18 USPQ2d 1001, 1012 (Fed. Cir. 1991).

In Chemcast Corp. v. Arco Industrial Corp., 913 F.2d 923, 16 USPQ2d 1033 (Fed. Cir. 1990), the Federal Circuit Court of Appeals (which holds plenary jurisdiction over appeals of final decisions concerning, in whole or part, patents, see 28 U.S.C. § 1295(9)(a)) described the two-step analysis used to determine compliance with the best mode requirement. The first step, which is wholly subjective, involves determining whether the inventor knew of a mode of practicing the claimed invention that he considered to be better than any other at the time he filed his application.  If the inventor contemplated such a preferred mode, the second step is to compare what he knew with what he disclosed to determine whether the disclosure is adequate to enable one skilled in the art to practice the best mode.  The second step, which involves assessing the adequacy of the disclosure, is largely an objective inquiry that depends upon the scope of the claimed invention and the level of skill in the art.  Chemcast, 913 F.2d at 927, 16 USPQ2d at 1036–37.  Even where there is a general reference to the best mode of practicing the claimed invention, the quality of the disclosure may be so poor as to effectively conceal it. Randomex Inc. v. Scopus Corp., 849 F.2d 585, 587, 7 USPQ2d 1050, 1052 (Fed. Cir. 1988); see In re Sherwood, 613 F.2d 809, 816, 204 USPQ 537, 544 (CCPA 1980), cert. denied, 450 U.S. 994, 101 S. Ct. 1694, 68 L.Ed.2d 193 (1981).

However, the best mode requirement does not require an inventor to disclose *production* details so long as the means to carry out the invention are disclosed.  Wahl Instruments, Inc. v. Acvious, Inc., 950 F.2d 1575, 1580, 21 USPQ2d 1123, 1127 (Fed. Cir. 1991);  see also In re Gay, 309 F.2d at 774, 135 USPQ at 316.  This includes providing supplier/trade name information where it is not needed, i.e., where such information would be "mere surplusage—an

addition to the generic description." Randomex, 849 F.2d at 590, 7 USPQ2d at 1054.  Such supplier/trade name information must be provided only when a skilled artisan could not practice the best mode of the claimed invention absent this information.  See Chemcast, 913 F.2d 923, 16 USPQ2d 1033 (patentee failed to disclose specific composition of preferred material or fact that it possessed a specific hardness, instead merely supplying a very general description of the material and a broad hardness range, thus effectively concealing the best mode).  Were this a patent infringement matter, the burden of establishing invalidity by this standard lies with the party seeking such a holding, namely, Defendant Sirous Asgari.  This however, is not such a case and testimony or evidence of the above is irrelevant and would only serve to confuse the jury.

Moreover, the "best mode" and duty of candor analysis noted above apply only *at the time the patent application is made* and does not extend indefinitely onward.  Indeed, Congress has explicitly prohibited patent applicants from amending their applications based on data discovered post-application.  See 35 U.S.C. § 132 (strictly prohibiting the addition of new material into a patent); see also Transco Products Inc. v. Performance Contracting, Inc., 38 F.3d 551, 558-59 (Fed. Cir. 1994) (holding the relevant date for evaluating a best mode disclosure is the date of the initial application).  In Transco, the Federal Circuit determined that the district court's decision and determination that a patent holder should have amended his patent application "illustrate[d] a misunderstanding of patent law and patent office practice. The subject matter that the district court believes Pinsky should have disclosed in his continuation application would clearly have constituted 'new matter' pursuant to 35 U.S.C. § 132, 37 C.F.R. § 1.118, and MPEP §§ 608.04(a)–(c) and 706.03(o)."  Id.  The Transco court stressed that "the introduction of a new best mode disclosure would constitute the injection of 'new matter' into the application and automatically deprive the applicant of the benefit of the earlier filing date of

22

the parent or original application for any claim whose validity rests on the new best mode disclosure." Id. It would be an odd result to hold that a patent applicant, who met its duty of candor at the time of the initial application in disclosing the then-known best mode, and was prohibited by law from amending that application based on a new discovery, could somehow be found to be a "bad actor" for continuing research. "Such a rule would subvert the patent system's goal of promoting useful arts through encouraging early disclosure. An inventor's motivation to file early and then continue to test and improve upon his invention would be stifled [by such a rule]." Transco, 38 F.3d at 558. Accordingly, Congress and the Federal Circuit have recognized that such a strict barrier would effectively limit and discourage further invention and refinements of technology because to hold otherwise would require inventors to stop research and development once they patent an idea and effectively freeze in time all further beneficial discoveries.

          2.    <u>The Parties and the Court Misunderstood Swagelok's Patented Process</u>

Additionally, the government submits that Swagelok has not failed to meet its duty of candor. Instead the parties and the Court have mistakenly read the import of the patented process. In its Order on Defendant's Motion to Dismiss, the Court opined that because the patent application states that "[d]ifferent temperatures can also be used for activation and carburization, although there is no particular advantage in doing so," Swagelok was not candid with the patent office. This reading is a misunderstanding of the process that was actually patented, and as demonstrated below, taken out of context.

As described in the patent application, the conventional process of low-temperature carburization of stainless steel involved two phases: First, "Activation," wherein the layer of chromium oxide (the layer on stainless steel that makes it corrosion resistant) is made

23

"transparent" to allow the metal to be infused with carbon atoms to enhance hardness.  See U.S. Patent App. No. 12/850925 at [0007], [0042] (filed Aug. 5, 2010).  In conventional low-temperature carburization processes, this initial Activation stage occurs at lower temperatures between 200 and 400 degrees Celsius.  Id.  The second phase after Activation is "Carburization," in which the metal is essentially bombarded with carbon atoms to increase its case hardness.  This process typically takes place at higher temperatures, and in the case of low-temperature carburization at around 450 to 525 degrees Celsius.  Id. at [0005], [0023].  The drawback to this technique is that unwanted byproducts, such as soot, a porous thermal oxide film and carbide precipitates, can form on the surface of the treated metals, requiring removal after treatment.  Id. at [0008].

To combat these effects, Swagelok patented the soft-vacuum process.  The process included a single-temperature approach to both Activation and Carburization, rather than submitting the metal to lower-temperature Activation followed by higher-temperature Carburization.  Id. at [0043] ("activation is done not only in the same reactor as carburization [but also] at essentially the same temperature.").  This novel process thus "makes control of the overall system easier."  Id.

Understanding the provisions of Paragraph [0043] of the application, the meaning of the entirety of Paragraph [0044], provided below, becomes clearer:

> [0044] In this embodiment, the reaction temperature **during both activation and carburization is normally kept essentially the same**, since this most convenient. Although these temperatures, e.g., 350.degree. C. to 450.degree. C. or even 510.degree. C., are higher than normally encountered in conventional **activation** for low temperature carburization (200.degree. C. to 400.degree. C.), they are nonetheless effective especially if the activating gas is somewhat diluted as further discussed below. **Different temperatures can also be used for activation and carburization**, although there is no particular advantage in doing so. If different temperatures are used, the difference will normally be no more than about 100.degree. C., 50.degree. C., 25.degree. C., or even 10.degree. C.

24

Id. at [0044] (emphasis added).  Rather than "hiding the ball," the inventor is stating that an individual could use the patented process (i.e., activating and carburizing at the *same temperature*) or use the conventional process (i.e., using one temperature for activation and a *different temperature* for carburization).  However, as stated, there is no particular advantage to using the latter method.[2]  The former process, the carburization and activation under similar or unchanging conditions, is what is claimed under the patent application.

There is no disclosure of the optimal temperature for carrying out the novel activation/carburization process, nor is there a claim to the same in the application.  Indeed, the optimal temperature was not known at the time the Patent Application was filed.  Instead, out of concern to protect their intellectual property the company made the decision to protect the novel process of activating and carburizing metals under similar conditions (to include the same temperature for both stages), by filing an application as to that process as early as possible and later continued research into the optimal temperature at which to carry out that process.  Instead, as the company was rightfully and legally allowed to do, it guarded any later-discovered best modes of employing the patented process as a trade secret.  Indeed, the company was prohibited by law from injecting new matter into the filed application lest they lose their patent protection as of the date of original filing.  It is this later discovered and reasonably protected optimal temperature and conditions that Defendant later appropriated through fraud and misrepresentations.

---

[2] In fact, as explained in the soft-vacuum patent, the conventional low-temperature carburization method using different temperatures for activation and carburization is *disadvantageous* in that it creates unwanted byproducts on the treated metals.  The statement that using different temperatures presents no particular advantage is therefore one that possesses multiple truths.

3.    Conclusion

As discussed above, the confusion that may result from unnecessary forays into patent law are far more prejudicial than probative, and will not serve to illuminate the underlying question, which is whether Defendant appropriated a method or process that Swagelok kept closely guarded as a trade secret. Questions about whether the company honored its duty of candor are irrelevant to this inquiry and will only confuse the matter. Moreover, such immaterial line of questioning may improperly lead to erroneous conclusions as demonstrated above.

C.    DEFENDANT MAY NOT SEEK TO ADMIT HIS OWN SELF-SERVING OUT-OF-COURT STATEMENTS

It is well-settled that a defendant cannot seek to introduce his own self-serving, exculpatory statements. United States v. Wilkerson, 84 F.3d 692, 696 (4th Cir. 1996). "[D]uring direct examination, the government could have introduced inculpatory statements made by [the defendant]. The rules do not, however, provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party." Id. Thus, while the Government is permitted to introduce the defendant's statements against him as non-hearsay admissions of a party-opponent under Rule 801(d)(2), or co-conspirator statements under Rule 801(d)(2)(E), a defendant is not permitted to introduce his own statements under the same rules.

For example, a defendant may try to introduce his own out-of-court exculpatory statements, either in the form of witness testimony or recorded conversations. This evidence would clearly be hearsay and inadmissible under Rule 802. In United States v. Hunt, the Sixth Circuit considered the admissibility of out-of-court statements of a co-defendant, which were memorialized in an affidavit signed by the defendant. 521 F.3d 636 (6th Cir. 2008). Hunt sought to introduce the affidavit as evidence because statements contained therein exculpated Hunt. Id.

26

at 642-43.  Hunt sought admission of the affidavit under Rules 804(b)(1) (former testimony) and

Rule 807 (residual hearsay exception). The Sixth Circuit affirmed the district court's exclusion of

the affidavit as inadmissible hearsay.  Id. at 643.

A party cannot establish a defense by introducing his own statement through a third-party

witness. If a defendant wants his or her version of the events before the court, that defendant

must take the witness stand, under oath, and be subject to cross-examination. United States v.

Nakai, 413 F.3d 1019, 1022 (9th Cir. 2005) (rejecting the defendant's attempt to introduce his

own exculpatory statement).

D.      AUTHENTICATION OF BUSINESS RECORDS – RULE 902(11) AND
        902(13)

Rule 902(11) of the Federal Rules of Evidence permits the authentication of business

records with an out-of-court certification, rather than requiring the testimony of a record

custodian at trial. Rule 902(11) states:

**Self-authentication**

Extrinsic evidence of authenticity . . .

\* \* \* \*

**(11) Certified domestic records of regularly conducted activity**. The original or a
duplicate of a domestic record of regularly conducted activity that would be admissible
under Rule 803(6) if accompanied by a written declaration of its custodian or other
qualified person, in a manner complying with any Act of Congress or rule prescribed by
the Supreme Court pursuant to statutory authority, certifying that the record --

(A) was made at or near the time of the occurrence of the matters set forth by, or from
information transmitted by, a person with knowledge of those matters;

(B) was kept in the course of the regularly conducted activity; and

(C) was made by the regularly conducted activity as a regular practice.

A party intending to offer a record into evidence under this paragraph must provide
written notice of that intention to all adverse parties, and must make the record and

> declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

Rule 902(11) of the Federal Rules of Evidence. Federal Rule of Evidence 902(11) provides that documents that would be admissible as a business record may be authenticated without a witness "if accompanied by a written declaration of its custodian or other qualified person, in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority, certifying that the record--(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (B) was kept in the course of the regularly conducted activity; and (C) was made by the regularly conducted activity as a regular practice."  Rule 902(13) extends the provisions of Rule 902(11) to electronically stored information, such as Defendant's emails provided by Google.

The government intends to offer into evidence the emails provided by Google and has obtained appropriate certifications for such business and electronically stored records pursuant to Rules 803(6), 902(11) and 902(13).  By seeking to admit these records as self-authenticating, the government seeks to streamline and economize the presentation of evidence at trial without the interjection of superfluous witnesses.  By providing these records in advance of trial and providing notice of its intention to the Court and the parties, the Government has provided Defendant a fair opportunity to challenge them.  Defendant has not objected in a timely manner. The government has consulted with defense counsel and received no response on this matter.

E.      SUMMARY/DEMONSTRATIVE EXHIBITS

The Court is aware that the Indictment charges theft of trade secrets, an ongoing scheme to defraud involving numerous wires and visa fraud.  These schemes involved numerous steps and communications by defendant, many of which occurred over emails sent and received by him.  To present this evidence in an efficient and organized way, the Government is preparing

28

summary charts, which will depict, among other things, a timeline demonstrating the order of Asgari's interactions with CWRU and Swagelok employees, his use of emails to exfiltrate proprietary and trade secret information, and his false representations to the U.S. Department of State.

These summary charts are themselves admissible evidence under Federal Rule of Evidence 1006, and the Government will seek to admit them as substantive evidence, which the jury can reference during deliberations. Federal Rule of Evidence 1006 permits for such use of summary charts, by providing that "contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." The use of summary materials has been approved by the Sixth Circuit. See United States v. Bray, 139 F.3d 1104, 1112 (6th Cir. 1998). The Government will also include or supplement its proposed jury instructions, the Sixth Circuit's pattern jury instruction 7.12.

The summary charts will accurately depict the evidence to be presented to the jury and will streamline the trial considerably by condensing numerous of exhibits into a handful of summary charts. For each summary chart the Government anticipates using at trial, the Government has complied with Rule 1006 by providing the underlying documents to Defendant and/or making the underlying documents available for examination and copying in advance of the Court's discovery deadline. Furthermore, the Government will provide the charts to Defendant in advance of trial.

The government is also preparing pedagogical or demonstrative exhibits to assist the jury in understanding the Visa Application process.  These exhibits are to be used to assist the jury in understanding how the online Visa Application process works.  They will be authenticated by the

government's State Department witness to demonstrate the rather un-byzantine nature of the

application process. "Trial courts have discretionary authority to permit counsel to employ such

pedagogical-device 'summaries' to clarify and simplify complex testimony or other information

and evidence or to assist counsel in the presentation of argument to the court or jury." Bray, 139

F.3d at 1111. The use of such aids also falls within Fed. R. Evid. 611(a) as a means by which

economize and streamline the presentation of evidence to the jury. Id. at 1111-12. Finally, the

government may seek to admit the pedagogical summaries as secondary-evidence summaries in

that

> they are not prepared entirely in compliance with Rule 1006 and yet are more than
> mere pedagogical devices designed to simplify and clarify other evidence in the
> case. These secondary-evidence summaries are admitted in evidence not in lieu of
> the evidence they summarize but in addition thereto, because in the judgment of
> the trial court such summaries so accurately and reliably summarize complex or
> difficult evidence that is received in the case as to materially assist the jurors in
> better understanding the evidence

Id. at 1112. Assuming the secondary evidence summaries are properly admitted, the government

will ask the Court to instruct the jury "that the summary is not independent evidence of its

subject matter, and is only as valid and reliable as the underlying evidence it summarizes."

Id.

### F.    HYBRID WITNESSES

In an abundance of caution, pursuant to Rule 16(a)(1)(G) of the Federal Rules of

Criminal Procedure, the United States provided defendant with notice of the following

individuals who may provide opinion testimony:

- Dr. Greg S. Shaw, Director of Innovation and Technology, Swagelok

- Mr. David H. Peace, Vice President of Engineering, Swagelok

- Dr. Sunniva Collins, Professor, Case Western Reserve University

- Valerie J. Chittenden, Senior Coordinator, Visa Office, Bureau of Consular Affairs, Department of State

Of these witnesses, only Ms. Chittenden will be providing expert testimony as an expert witness regarding the defendant's 2012 visa application.  She will testify as to the visa application process, specifically the characteristics and nature of the relevant visa categories (B1/B2, J, H1B, etc.) and the operation of the on-line visa application process.  Ms. Chittenden will opine that it is material to the decision to grant a B1/B2 visa if an applicant states that the purpose of his or her trip was to visit children, not to accept or seek employment.  Ms. Chittenden will further opine that a nonimmigrant B-1/B-2 visa does not authorize a person to work in the United States or authorize an academic or scientific researcher to conduct research at United States institutions that would benefit the United States institution.  She will further testify that any academic or scientific researcher who intended to conduct research work that would benefit a United States institution was required to obtain either an H-1B Temporary Worker visa or a J Exchange Visitor visa.

The remaining above-listed witnesses will testify primarily as fact witnesses regarding Swagelok's development of the SAT12 process and the steps it takes to protect its trade secrets and proprietary information.  A witness may testify as a dual role witness.  United States v. Seely, 308 Fed. Appx. 870 (6th Cir. 2009).  To the extent the government seeks to elicit expert opinion from a witness, the attorney for the government will ask the witness upon what his or her opinion is based.

> Telling the jury that a witness is both a lay witness and an expert witness and will be alternating between the two roles is potentially confusing—and unnecessary. The lawyer examining the witness need only ask him the basis for his answer to a question, and the witness will then explain whether it was his investigation of the defendants' conspiracy or his general experience in decoding drug code. That tells the jury what it needs to know in order to determine how much weight to give the testimony and tells opposing counsel what he needs to know in order to be able to

31

cross-examine the witness effectively. Using terms like "lay witness" and "expert witness" and trying to explain to the jury the difference between the two types of witness is inessential and, it seems to us, ill advised.

United States v. Moreland, 703 F.3d 976, 983-84 (7th Cir. 2012). See also United States v. Rios/Casillas, 2016 WL 3923881 (6th Cir. July 21, 2016) (harmless error).

The government will also be calling multiple witnesses who hold specific scientific knowledge. Despite their scientific knowledge, these witnesses will not be asked to give an opinion based on their education or experience.

G.    PRESENCE OF WITNESSES AT CERTAIN STAGES

The Government anticipates the Court ordering a separation of witnesses pursuant to Federal Rule of Evidence 615. Federal Rule of Evidence 615(2) specifically excludes from the sequestration order "an officer or employee of a party which is not a natural person designated as its representative by its attorney." The Government anticipates designating FBI Special Agent Kurt Dirker, the case agent as the Government's representatives present at counsel table.

In addition to requesting SA Dirker's presence, the government requests that the Court permit its expert witness, Dr. Greg Shaw, to sit at counsel's table during any expert testimony presented by Defendant concerning the trade secrets and during Defendant's own testimony, should he elect to testify in his own defense. Federal Rule of Evidence 615(3) provides an additional exception to the court's sequestration order for witnesses "whose presence is shown by a party to be essential to the presentation of the party's cause." See United States v. Mohney, 949 F.2d 1397, 1404-05 (6th Cir. 1991). The rule, therefore, allows the Government to designate representatives in addition to the case agent for certain prosecutions that are sufficiently complex so that "the aid of more than one law enforcement officer is needed to sort through extensive, technical evidence, and to help 'map out strategy.'" United States v. Phibbs, 999 F.2d 1053,

1072 (6th Cir. 1993). "The 'essential' witness exception set out in Rule 615(3) 'contemplates such persons as an agent who handled the transaction being litigated or an expert needed to advise counsel in the management of the litigation.'" Id. at 1073 (quoting Advisory Committee Notes to Fed.R.Evid. 615). Witnesses who will offer some form of expert or opinion testimony may also be deemed "essential" under Fed. R. Evid. 615. "[W]here a fair showing has been made that the expert witness is in fact required for the management of the case, and this is made clear to the trial court, we believe that the trial court is bound to accept any reasonable, substantiated representation to this effect by counsel." United States v. Mohney, 949 F.2d at 1405 (upholding trial court's decision to exclude IRS agents from sequestration where agents offered expert testimony).

As alluded to in previous filings and herein, this case involves significant technical issues concerning the process of low-temperature carburization of stainless steels. The assistance of Dr. Shaw, who possesses a Ph. D. in Material Science and Engineering, is necessary for the government to handle the extensive technical information and data expected to be presented by Defendant's experts, and to assist the government in mapping out its litigation strategy. The government does not oppose any similar request by Defendant to have his own experts present at counsel's table during the testimony of the government's expert witnesses.

H.    PRESENTATION OF RESTRICTED/PROTECTED TRADE SECRETS AT TRIAL

The Government has previously moved this Court to enter a protective order governing the exhibition and use of trade secret protected materials in Court. See (R. 91: Motion for Protective Order, PageID 975). Defendant has not filed an objection, and the parties proceeded at a pre-trial hearing following the guidelines set forth in the proposed order. However, the

33

Court has not yet ruled on this motion, and the government respectfully requests that it do so in advance of trial.

> I.     CHARACTER EVIDENCE/GOOD GUY EVIDENCE

The Government respectfully moves the Court to exclude all evidence of Defendant's lawfulness and non-corrupt conduct, except for reputation or opinion evidence offered by character witnesses strictly in accord with the limitations of Federal Rule of Evidence 405(a). Other than testimony from character witnesses falling within the narrow strictures of Rule 405(a), no such evidence is admissible.

In Defendant's Motion to Suppress, he asserts that he is a "respected and renowned material science expert … and a family man with significant ties to the United States."  (R. 67: Mot. to Suppress, PageID 320, 321).  Based on these representations, the government expects that Defendant will espouse his status as a man who is married and has children, coupled with his work ethic, and alleged "renowned" status as a TEM operator, among other "good act" evidence either during opening statement, through cross-examination, or through his own witnesses.  Such evidence is improper character evidence and inadmissible.

> 1.     Good Acts Evidence is Irrelevant and Inadmissible

Federal Rules of Evidence 404(a) permits the limited use of character evidence in defined circumstances.  Rule 404(a)(1) renders admissible "evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same."  Although Rule 404(a) does not define "character trait," the term has traditionally "refer[red] to elements of one's disposition, 'such as honesty, temperance, or peacefulness.'"  United States v. West, 670 F.2d 675, 682 (7th Cir. 1982).  For each count in the Indictment, certain character traits may or may not be pertinent.

2.    Defendant's Methods for Proving Character

Should Defendant establish a basis for the admission of character evidence, Federal Rule of Evidence 405(a) governs the manner in which character may be proved.  Generally, evidence of a defendant's character <u>must be presented in the form of opinion or reputation testimony</u>.[3] (emphasis added).  Often, a defendant seeks to establish his innocence of the charged offenses through proof of the absence of criminal acts on specific occasions.  Such is an attempt to prove character through specific acts, which is impermissible.  <u>United States v. Scarpa</u>, 897 F.2d 63, 70 (2d Cir. 1990).  <u>See</u> <u>United States v. Daulton</u>, 266 Fed. Appx. 381, 386 (6th Cir. 2008) (citations and internal quotations omitted) ("Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."); <u>United States v. Camejo</u>, 929 F.2d 610, 613 (11th Cir. 1991)("Evidence of good conduct is not admissible to negate criminal intent.").

In <u>United States v. Hill</u>, 40 F.3d 164, 169 (7th Cir. 1994), the defendant attempted to offer evidence of her failure to steal three test letters to prove that she did not embezzle the items charged in the indictment.  In affirming the trial court's denial of such evidence, the Seventh Circuit noted that the defendant "offers no authority for her argument that law-abidingness is a pertinent character trait for the crimes with which she was charged."  <u>Id.</u> at 169.  The court continued, "[a]ssuming law-abidingness was a pertinent character trait, however, the proper method of proof would have been by reputation or opinion testimony."  <u>Id.</u>

In <u>United States v. Ellisor</u>, 522 F.3d 1255 (11th Cir. 2008), defendant was convicted on eight counts of mail fraud for selling tickets to school children for a "Christmas From Around the

---

[3]Only when character "is an essential element of a charge, claim or defense," may the defendant introduce specific instances of conduct.  FRE 405(b).

World" event defendant was allegedly promoting.  Defendant collected money from school children, but when the children arrived for the show, the doors were locked.  Defendant had absconded with the money.  Defendant had moved the court, *in limine*, to introduce evidence of his prior legitimate business practices to negate evidence of his fraudulent intent.  The Eleventh Circuit upheld the district court's decision to exclude this evidence under Rule 404(b) and 405(v), stating, "[E]vidence of good conduct is not admissible to negate criminal intent." Id. At 1270 (citations omitted).  The Court explained, "[t]he fact that [defendant] purportedly produced other shows does not bear on his intent to defraud with respect to the Christmas show, and is therefore irrelevant." Id.

Often in an effort to distract the jury from the charges for which a defendant stands trial, he may seek to elicit evidence that on prior occasions, he committed good acts, such as properly doing his job.  Sometimes such evidence is affirmatively offered, but often defendant presents the evidence in the form of questions posed on cross-examination, such as, "Isn't it true that defendant did not do anything improper on this occasion?" or "Isn't it true defendant always treated you with respect?" or "Isn't it true that defendant was a hard worker?" The possible means by which Defendant may seek to offer evidence concerning good acts is limited only by his imagination.  Any evidence of this sort is inadmissible and should be excluded.

To the extent Defendant offers character evidence, he should be permitted to do so only in accordance with the limitations of Federal Rule of Evidence 405(a), which limits him to opinion or reputation testimony, not specific acts of good conduct.

### 3.  Defendant Should be Required to Give Advance Notice of Any "Good Acts" Evidence He Intends to Offer

Only under certain circumstances must a defendant give advance notice of evidence, such as when he intends to offer alibi or expert evidence.  Fed. R. Crim. P. 12.1, 16(b)(1)(C).

Although "good acts" evidence does not fall into these categories, any evidence or argument concerning "good acts" almost certainly would be inadmissible.  Accordingly, and in order to avoid surprise and possible error, it would be proper for the Court to require that the defense disclose any such evidence or argument in advance, in order to provide the Government an opportunity to object.  United States v. Shields, No. 90CR1044, 1991 WL 236492 at *2 (N.D. Ill. August 13, 1991).  Absent such notice, Defendant should be barred from referring to specific "good acts" in opening statements.

The case of United States v. Kemp illustrates complications that could arise absent such notice.  362 F. Supp. 2d 591 (E.D. Pa. 2005).  In that case, the defendant did not seek a pretrial ruling regarding the intent to offer certain evidence, including evidence of "consciousness of innocence" and evidence that certain unspecified improper motives had influenced the government.  The defense raised these purported defenses in the opening statement, after which the government moved in limine to preclude the defenses.  In response, defendant argued that not only was the evidence admissible, but the fact that the defense already argued in opening statement was reason enough to permit the defenses.  The court ruled that the evidence was inadmissible, rejecting "as an extreme form of 'bootstrapping' the [d]efendants' argument that because this purported defense was raised in their counsel's opening argument to the jury without an objection by the government being upheld by the Court, it has necessarily been approved." Id. at 593.  The Court further rejected the claim that by excluding the evidence, the appellate court would find counsel ineffective for arguing a defense not supported by the evidence.  The court stated, "[C]arried to its logical extreme, [this position] would encourage defense counsel to include clearly inadmissible evidence in their opening arguments because their failure to follow

through with supporting evidence would automatically entitle their clients to a new trial and/or post-conviction remedy." Id.

To avoid the issue presented in Kemp, the Government respectfully requests this Court order Defendant to provide advance notice of his intent to offer any "good acts" evidence. Absent such notice, the Government respectfully requests that Defendant be barred from referring to specific "good acts" in opening statements and from introducing such evidence.

### 4.    Rebutting the Defendant's Character Evidence.

"[O]nce the defendant has 'opened the door' by offering evidence as to his good character, the prosecution may rebut that evidence." United States v. Clark, 26 Fed. Appx. 422 (6th Cir. 2001) (quoting United States v. McGuire, 744 F.2d 1197, 1204 (6th Cir. 1984)).  The Supreme Court has long cautioned defendants:

> The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him.  The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue.  Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusion.  It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate.  Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

Michelson v. United States, 335 U.S. 469, 479 (1948).

While the defendant is limited to opinion and reputation testimony to prove character, the prosecution may rebut that evidence through cross-examination of defense witnesses about specific instances of conduct and through testimony of character witnesses.  Id.  Should

Defendant put forth evidence of his good character in his defense, the Government intends to rebut such evidence through all means permissible under the Federal Rules of Evidence.

**V.      TRIAL DOCUMENTS**

Due to their length, the government's proposed jury instructions and voir dire have been filed under separate cover.  The government will provide the Court and Defendant with a copy of the exhibits on Monday, April 2, 2018.  Additionally, the government will provide the Court with its witness list on April 2, 2018.

**VI.     ESTIMATED LENGTH OF TRIAL**

The United States expects to complete its case-in-chief in approximately three (3) business days.

## VII.   **CONCLUSION**

The United States is prepared to submit additional briefing on any issue should the Court

or circumstances require.


Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:   <u>/s/ Om M. Kakani</u>
Om M. Kakani (NY: 4337705)
Daniel J. Riedl (OH: 0076798)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3756/3669
(216) 522-7358 (facsimile)
Om.Kakani@usdoj.gov
Daniel.Riedl@usdoj.gov

William A. Mackie,
Trial Attorney, National Security
Division, Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of March, 2018, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Om M. Kakani
Om M. Kakani
Assistant U.S. Attorney