UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
: 
UNITED STATES OF AMERICA, :  Case No. 1:16-cr-124
: 
    Plaintiff, :
: 
vs. :  OPINION & ORDER
:  [Resolving Doc. 67]
SIROUS ASGARI, :
: 
    Defendant. :
: 
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

  A grand jury indicted Defendant Sirous Asgari for theft of trade secrets, wire fraud, and visa fraud.[1] Asgari moves to suppress evidence collected from two search warrants that had allowed the government to search and seize his emails.[2] For the following reasons, the Court **GRANTS** Asgari's motion to suppress.

## I. Background

  The government requested and obtained two search warrants for the content of Sirous Asgari's personal Gmail email account.[3] The FBI obtained the first warrant on February 26, 2013 and obtained the second search warrant on January 28, 2015.[4]

  Most generally, Defendant Asgari argues that the affidavit used to obtain the February 26, 2013, search warrant did not provide probable cause to conduct the search.[5] Asgari also argues that the arguably improper February 26, 2013, search warrant taints the January 28, 2015, search warrant.[6] Finally, Asgari claims that the investigating FBI agent had no objectively reasonable

---

[1] Doc. 7.
[2] Doc. 67. The government opposes. Doc. 69. Asgari replies. Doc. 80.
[3] *See* Doc. 69-1; Doc. 69-2.
[4] *See* Doc. 69-1; Doc. 69-2.
[5] *See generally* Doc. 67.
[6] *Id.* at 12 (page numbers refer to the page of the document filed with the Court).

basis for believing that the warrant was valid.[7]  In partial support of this argument, Asgari says the investigating FBI agent reflected this inadequate affidavit by ginning his first affidavit with damaging information that had little relation to Asgari.[8]

**A. Challenge to the Sufficiency of the Search Warrant Affidavits**

The 2013 search warrant affidavit sought to establish probable cause to believe that Asgari had made false statements in violation of 18 U.S.C. § 1001(a)(2) and had violated the trade embargo on Iran established under the International Emergency Economic Powers Act, 50 U.S.C.§ 1705(a) (hereinafter the "Iran sanctions").[9]  FBI Special Agent Timothy Boggs gave the affidavit used to obtain this warrant.

A person makes a false statement in violation of 18 U.S.C. § 1001 when that defendant knowingly and willfully makes any materially false, fictitious, or fraudulent statement to a federal official.[10]  To violate the Iran sanctions, Asgari would need to willingly export, sell, or supply some goods, technology, or services to Iran during the period Iran was subject to embargo.[11]

Similar to the 2013 affidavit, the 2015 search warrant affidavit sought to establish probable cause to believe that Asgari committed visa fraud under 18 U.S.C. § 1546(a); violated 18 U.S.C. § 1832, which prohibits theft of trade secrets; and violated 50 U.S.C. § 1705(a), which prohibits International Emergency Economic Powers Act ("the Iran sanctions") violations.[12]  FBI Special Agent Matthew Olson submitted the affidavit in support of the 2015 search warrant.

Both affidavits describe the same general set of facts.  The affidavits for both search

---

[7] *See id.* at 11.
[8] *See* Doc. 80 at 2-5.
[9] Doc. 69-1 at 7.
[10] *See* 18 U.S.C. § 1001(a)(3); *Fayzullina v. Holder*, 777 F.3d 807, 809-10 (6th Cir. 2015); *United States v. Geisen*, 612 F.3d 471, 489 (6th Cir. 2010).
[11] *See* 50 U.S.C. § 1705(c); Executive Order 13059; *U.S. v. Hanna*, 661 F.3d 271 (6th Cir. 2011) (upholding conviction for violating the Iraq sanctions for shipping telecommunications and navigation equipment to Iraq).
[12] Doc. 69-2 at 9-10.

warrants testified that Sirous Asgari is an Iranian citizen.[13]  The affidavit went on to say: "Asgari

is a [metallurgy] professor at Sharif University, Department of Materials Science and Engineering"

and had received his 1997 Ph.D. at Drexel University near Philadelphia.[14]  The affidavit described

Asgari as having "two children in the U.S., one is a student at Columbia University and one is at

Duke University."[15]

> Most significantly, the supporting affidavits then identified Asgari as having "ties to the

government of Iran, through his employment with Sharif University."[16]  Importantly for probable

cause to support the Iran sanctions claim, the affiant thus alleged Asgari had "ties to the

government of Iran."[17]

> The affidavits then described Sharif University as a Tehran technology, engineering and

physical sciences university, and as "one of Iran's most prestigious universities."[18]  The affidavits

then say that Sharif University receives funding from both the Iranian government and private

sources.[19]

> The affidavits then state that Sharif University has performed research for projects for the

Iranian Navy.[20]  As support for Sharif University's connection with the Iranian government, the

2013 affidavit relies upon nothing more than a 2010 Ph.D. student paper entitled "Neural Networks

Control of Autonomous Underwater Vehicle," which had been written by a student on Sharif

University's Kish Island campus.[21]  The affidavit does not say this Ph.D. student ever studied

under Asgari or had any connection to Asgari.  And the FBI agent's citation to an obscure Ph.D.

---

[13] Doc. 69-1 at 7; Doc. 69-2 at 10.
[14] Doc. 69-1 at 7; Doc. 69-2 at 10.
[15] Doc. 69-1 at 7; Doc. 69-2 at 10.
[16] Doc. 69-1 at 8; Doc. 69-2 at 10.
[17] Doc. 69-1 at 8; Doc. 69-2 at 10.
[18] Doc. 69-1 at 8; Doc. 69-2 at 10.
[19] Doc. 69-1 at 7; Doc. 69-2 at 10.
[20] Doc. 69-1 at 8; Doc. 69-2 at 10.
[21] Doc. 69-1 at 8 n.2; Doc. 69-2 at 10 n.2.

student paper nowhere mentions that the paper actually deals with underwater vehicles exploring commercial, not governmental, mineral research.[22]

In an apparent attempt to show probable cause to believe visa fraud had occurred, the affidavits then allege that on several occasions in 2011 and 2012, Asgari said that he was coming to the United States to visit his children.[23] However, during these trips Asgari performed research at the Case Western Swagelok Center for Surface Analysis of Materials ("Swagelok Center").[24] According to the Swagelok Center's director, Arthur Heuer, the Swagelok Center is an assembly of precise instruments used for materials analysis.[25]

During Asgari's November 2012 trip to the United States, Swagelok Center Director Arthur Heuer hired Asgari to work at Case Western. According to the affidavit, Heuer told the FBI that it was "serendipity" that Asgari arrived at Case Western at the time Case Western "had just terminated a researcher who had come to the Center under false pretenses. The researcher claimed to have certain expertise with the instrumentation at the lab, but in reality he did not. Asgari happened to come to [Case Western] at the perfect time to take the researcher's place."[26]

In support for their Iran sanctions and theft of trade secrets allegations, the affidavits describe emails that Asgari sent and received while he was in the United States. In these emails, Asgari communicated with people in Iran, primarily students at Sharif University.[27]

The 2015 affidavit also describes emails where Asgari requested information from Swagelok Company researcher Dr. Sunniva Collins about metal samples and test results.[28] Asgari

---

[22] *See* Def. Ex. D.
[23] Doc. 69-1 at 8; Doc. 69-2 at 11.
[24] Doc. 69-1 at 8; Doc. 69-2 at 11.
[25] *See* Doc. 69-1 at 8.
[26] *Id.* at 10.
[27] Doc. 69-1 at 11-12; Doc. 69-2 at 12-15.
[28] Doc. 69-2 at 13-14.

also emailed what the 2015 affidavit describes as Case Western test results to Iranian students.[29]

FBI interviews with Swagelok Company representatives portray these emails as containing Swagelok Company proprietary and trade secret information.[30]  However, the affidavit also says that Swagelok Center Director Heuer stated in his FBI interviews that the metal samples Asgari had access to were commercially available, and the information Asgari had was either available in the Swagelok Company's patents or in public academic articles.[31]

### B. February 20, 2018, Motion to Suppress and *Franks* Hearing

On February 20, 2018, the Court held a hearing on this motion to suppress.  After initial argument from the parties, the Court conducted a *Franks* hearing and allowed Asgari to examine Special Agent Boggs, who signed the 2013 affidavit.[32]

## II. Legal Standard

### A. Probable Cause

The Fourth Amendment guarantees that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[33]  Probable cause is a fair probability that evidence of a crime will be found.[34]  An affidavit used to establish probable cause must provide the issuing magistrate a substantial basis for determining the existence of probable cause.[35]

Generally, courts exclude evidence obtained in violation of the Fourth Amendment.[36] However, if law enforcement officers acted in good faith and reasonably relied on the warrant, the

---

[29] *Id.*
[30] *Id.* at 19-22.
[31] *Id.* at 16-18.
[32] *See generally* Doc. 100.
[33] U.S. Const. Amend. IV.
[34] *See United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003).
[35] *United States v. Thomas,* 605 F.3d 300, 307 (6th Cir. 2010).
[36] *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *United States v. Alexander*, 540 F.3d 494, 501 (6th Cir. 2008).

evidence obtained is still admissible.[37]

This good faith exception does not apply in cases where the police have no objectively reasonable basis for believing that a warrant is valid: "in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"[38]

## B. *Franks* Analysis

Usually, "[w]hen making a probable cause determination, a court is limited to the four corners of the affidavit."[39] Accordingly, an affidavit is "judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added."[40]

An exception to this general rule exists for facts included in an affidavit that a defendant proves are "both (a) materially false [or misleading] and (b) made with reckless or intentional disregard for their falsity."[41] Statements proven intentionally or recklessly false must be stricken from the affidavit and "[i]f the redacted affidavit, purged of recklessly and materially false [or misleading] statements, no longer establishes probable cause, then the court must hold the resulting search warrant invalid."[42] Similarly, if a defendant shows "that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine

---

[37] *United States v. Leon*, 468 U.S. 897, 905 (1984); *see Davis v. United States*, 564 U.S. 229, 239 (2011) (citing *Leon*, 468 U.S. 897); *see also United States v. Carpenter*, 360 F.3d 591, 596-97 (6th Cir. 2004) (applying good faith exception where sufficient nexus existed between residence and illegal activity for police to reasonably believe a warrant valid).

[38] *Leon*, 468 U.S. at 923 (1984) (quoting *Brown v. Illinois*, 422 U.S., 590 at 610–611(1975)).

[39] *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013).

[40] *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

[41] *United States v. Elkins*, 300 F.3d 638, 649 (6th Cir. 2002); *see also United States v. Sawyers*, 127 F. App'x 174, 178 (6th Cir. 2005) (noting that misleading information can give rise to a *Franks* violation).

[42] *Id.* (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

whether probable cause still exists."[43]

### III. Analysis

**A. 2013 Warrant**

The Court finds that the 2013 search warrant affidavit does not establish probable cause and is so lacking in indicia of probable cause that an officer could not rely on it in good faith. Additionally, as described below, Agent Boggs knowingly or recklessly made material omissions in the 2013 search warrant affidavit. For these reasons, the Court finds that the 2013 affidavit does not establish probable cause, the *Leon* good faith exception cannot apply, and the evidence obtained from the 2013 search warrant must be suppressed.

**1.** *Probable Cause and Whether the* **Leon** *Good Faith Exception Can Apply*

*a. No Indicia of Probable Cause*

Nothing in the 2013 affidavit used to obtain the search warrant approaches probable cause.

As previously discussed, the Supreme Court has held that an officer cannot rely on a warrant in good faith when the supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[44] As described by the Sixth Circuit, when an "affidavit is 'bare bones,' the *Leon* good faith exception does not apply to rescue it."[45] "[A]n affidavit that states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a 'bare bones' affidavit," and fails to establish probable cause.[46]

Considering the totality of the circumstances, the 2013 Boggs affidavit is so bare bones that it was unreasonable for the executing officer to believe it valid. Asgari worked as a metallurgy

---

[43] *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997).

[44] *Leon*, 468 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 609 (1975)).

[45] *United States v. West*, 520 F.3d 604, 610 (6th Cir. 2008).

[46] *United States v. Ronnie Buffer*, 529 F. App'x 482, 484 (6th Cir. 2013) (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996)).

professor in a prominent Iranian engineering school.[47]  For some period, he collaborated on research with a Case Western engineering professor.[48]

The 2013 affidavit first says "Asgari has established ties to the government of Iran ('GOI'), through his employment with Sharif University [as a professor]."[49]  But mere employment as a professor at a state and privately supported university does not create probable cause.

The 2013 affidavit then says that Asgari came to Cleveland and did research at the Swagelok Center after having earlier worked at the Center with a research colleague, Dr. Pirouz: "Asgari came to [Case Western] on at least one other instance in 2011 or 2012 to work with this colleague at the Center."[50]

But the affidavit then lays out that Asgari began working at Case Western in 2012 with Swagelok Center Director Heuer by happenstance—a former researcher was terminated as unqualified: "Asgari happened to come to CWRU at the perfect time to take the researcher's place. While ASGARI does not have specific expertise in the Navy research, he is a very competent Metallurgist with expertise working with stainless steels and he is familiar with the instruments in the Center."[51]  Further, Heuer stated that at the time of his interview, "he was just talking today about putting the paper work in for a H[-]1B [visa], which would allow [Asgari] to stay and continue his research in the United States."[52]

Moreover, Dr. Heuer stated that "[c]urrently, there are no projects classified at a Secret or higher level being conducted at the Swagelok Center under the control or direction of [Case Western]."[53]  And in the 2013 affidavit, Director Heuer stated that the Swagelok Center

---

[47] Doc. 69-1 at 8.
[48] *Id.* at 8-9.
[49] *Id.* at 8.
[50] *Id.* at 9.
[51] *Id.* at 10.
[52] *Id.*
[53] *Id.* at 9.

information, "was not protected because it was all academic information and 'public domain.'"[54]
The 2013 affidavit did not give any evidence related to Asgari's Swagelok Center work that
supports probable cause that a false statement or Iran sanctions violation had occurred.

The 2013 affidavit shows minimal email traffic with Sharif University. But most of the
limited email traffic was with students,[55] unlikely collaborators in any effort to violate the Iran
sanctions.[56] Asgari sent and received only 20 emails to Sharif University professors or academics
over a three month period.[57] This email traffic is obviously insufficient to create probable cause.

And that is it. That summarizes the information used to establish probable cause to believe
a false statement or a violation of the Iran sanctions had occurred.

Although it is possible for "[s]eemingly innocent activity" to provide the basis for probable
cause,[58] that is not what occurred here. Here, Agent Boggs's affidavit laid out a set of background
facts that could easily apply to every Iranian researcher who comes to the United States. Agent
Boggs, or any other reasonable officer, should have known (and as his testimony shows, Agent
Boggs did know[59]) that these facts were so widely applicable that they could not establish a
probability of criminal wrongdoing.[60] At its essence, the 2013 affidavit only says that Asgari
worked as a metallurgy professor at an Iranian supported prominent engineering school. Without
more, that is not enough to show probable cause of an Iran sanctions violation.

---

[54] *Id.* at 9-10.
[55] *See id.* at 12.
[56] Indeed, the International Emergency Economic Powers Act explicitly exempts the transfer of "information or information materials" "whether commercial or otherwise" from the President's sanctions powers. 50 U.S.C. § 1703(b)(3). While it is possible that Asgari could send sanctions-violating materials to Sharif students or professors, the fact that he was an academic and working for and communicating with academic institutions makes this scenario highly unlikely.
[57] Doc. 69-1 at 12.
[58] *United States v. Graham*, 275 F.3d 490, 503 (6th Cir. 2001).
[59] Doc. 100 at 83:23-84:9 (agreeing that the facts alleged to support an Iran sanctions violation could apply to every Iranian researcher at Case Western).
[60] *See, e.g.*, *Helton*, 314 F.3d at 825 (finding that uncorroborated informant statements combined with otherwise irrelevant or innocent information "came well short of establishing probable cause").

Therefore, the 2013 search warrant affidavit is so lacking in indicia of probable cause that the evidence resulting from it must be suppressed.

### b. False and Misleading Statements under **Franks**

Even if the 2013 affidavit had somehow shown probable cause, it would still be subject to an attack under *Franks*. The Supreme Court has held in *Franks* and reaffirmed in *Leon* that the good faith exception cannot apply when an affidavit includes misleading information that "the affiant knew was false or would have known was false except for his reckless disregard of the truth."[61]

In light of Agent Boggs's testimony at the *Franks* hearing and the parties' exhibits, the Court finds that an officer could not have relied on the 2013 warrant in good faith. Agent Boggs included several misleading omissions in his 2013 search warrant affidavit. These omissions undoubtedly influenced the magistrate's probable cause finding.

First, Agent Boggs's statement that a Sharif University student paper on autonomous underwater vehicles was a Sharif University project "in support of the Iranian Navy" was wildly misleading.[62] That paper makes no mention of the Iranian, or any other country's Navy; mentions no military applications of its findings; and has no apparent connection to the Iranian military or Iranian government (except that Sharif University was partially state-funded).[63]

The paper is a dissertation written by a chemical and mechanical engineering Ph.D. candidate at Sharif University's Kish Island campus.[64] The Kish Island Sharif University campus sits roughly 1,000 kilometers from the Tehran Sharif University campus where Asgari worked.[65]

---

[61] *Leon*, 468 U.S. at 922-23 (citing *Franks*, 438 U.S. 154).
[62] See Doc. 69-1 at 8.
[63] *See* Def. Ex. D.
[64] *See id.*
[65] *See Tehran, Tehran Province, Iran to Kish Island, Kish, Iran*, Google Maps (noting that Kish Island, Iran is approximately 1,047 km from Tehran, Iran),
https://www.google.com/maps/dir/Tehran,+Tehran+Province,+Iran/Kish+Island,+Kish,+Iran/@31.0328798,48.1948

The paper deals with a general problem of navigation systems in autonomous underwater vehicles.[66]  Although the underwater vehicle utilized in the student's research was apparently created at a United States military academy,[67] the student paper only mentioned searching for natural resources.[68]

More importantly, Asgari has no described connection to this paper.  Asgari works at Sharif's campus in Tehran, not the Kish Island campus where this paper was written.[69]  Asgari did not write this paper nor supervise this student's research.  Indeed, the paper is in a totally different field from Asgari's.  Connecting Asgari to the Iranian government because of this paper would be akin to connecting a chemistry professor at the Ohio State University's  Columbus campus to the American government because an astronomy graduate student at Ohio State's Mansfield campus once did commercial telescope research that NASA could conceivably use.

Agent Boggs knew that Asgari's only connection to this research paper was that both Asgari and the student who wrote the paper performed research at Sharif.[70]  U.S. News and World Report estimates that Sharif has over 11,000 students and over 600 academic staff.[71]  The odds that a professor and a student in separate departments on campuses separated by 1000 kilometers would have any connection among this group of 11,600 people is so small that it might as well be zero.

It is clear to the Court that the information about this paper was included to create a false connection between Asgari and the Iranian Navy.  The Court finds that Agent Boggs hoped this

274,6z/data=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x3f8e00491ff3dcd9:0xf0b3697c567024bc!2m2!1d51.3889736!2d35.6891975!1m5!1m1!1s0x3e50a9147e298609:0x625dad11bc3932e2!2m2!1d53.9867949!2d26.5324775 (last visited April 3, 2018).
[66] *See generally* Def. Ex. D.
[67] Doc. 100 at 78:7-14.
[68] *Id.*
[69] *See* Doc. 69-1 at 3.
[70] *See* Doc. 100 at 78:2-14.
[71] *Sharif University of Technology*, U.S. News and World Report (2018), https://www.usnews.com/education/best-global-universities/sharif-university-of-technology-502898.

"connection" would increase the likelihood that the magistrate would believe Asgari violated the Iran sanctions by passing defense technology from Case Western's U.S. Navy-funded project to Iran's Navy.

Additionally, Agent Boggs's description of Asgari's visa application and subsequent work at Case Western contains materially misleading statements and omissions. Agent Boggs's affidavit represented that Asgari's visa application falsely represented that Asgari's only stated purpose for coming to the United States was to see his children. But, Asgari's November 2012 visa application does not bear out Agent Boggs's statement within the 2013 affidavit that Asgari's "stated purpose" for coming to the United States was to visit his children.[72] Asgari's application explicitly stated that his visit was, at least in part, for business reasons.[73]

Given Agent Boggs's testimony on this issue and the relative simplicity of the visa application form, the Court concludes that Agent Boggs included this mischaracterization of Asgari's visa application to bolster his case for probable cause.[74]

Similarly, Agent Boggs stated in the 2013 affidavit that Asgari did not disclose his Cleveland travel to the State Department and did not inform the Navy that he would work on an Office of Naval Research-funded project.[75] But Agent Boggs's affidavit failed to say that nothing required Asgari to do either of these things. Indeed, Asgari's visa application did not require any itinerary of his travel plans within the United States.[76] Neither Agent Boggs nor the government shows any other law or regulation that required Asgari to inform the United States of his Cleveland

---

[72] *Compare* Doc. 69-1 at 8, *with* Def. Ex. C.
[73] Def. Ex. C.
[74] Although Asgari had apparently mentioned his intention to visit his children in an August 2012 email to the State Department, Agent Boggs did not provide any indication that he based his description of Asgari's purpose on this email or even that he had access to this email until after executing the 2013 search warrant. *See* Doc. 100 at 128:15-19. Beyond this, Asgari's visa application stated his dual purposes of both business (i.e. his research) and pleasure (visiting his children). *See* Def. Ex. C.
[75] Doc. 69-1 at 10.
[76] *See* Def. Ex. C.

travel.

Agent Boggs's explanation of what Asgari could do on a B-1/B-2 visa also contains a material omission. In the 2013 affidavit Agent Boggs accurately states in a footnote that an individual cannot be employed or conduct research that will benefit a United States institution on a B-1/B-2 visa.[77] However, an individual *can* conduct his own independent research using a B-1/B-2 visa so long as the visa holder is not employed by or benefitting a United States institution.[78] This omission is material because, as previously discussed, the other facts in the affidavit all suggest that Asgari came to the United States to conduct his own research.

The State Department lists exactly this type of independent research as one of the uses of a B-1 visa in both its official policy statement in the Foreign Affairs Manual and in a flier available on its public website.[79]

Finally, the 2013 affidavit also contains material mischaracterizations about the uniqueness of Case Western's equipment. The affidavit states that Case Western "contains advanced research instrumentation not available in Iran."[80]

Agent Boggs stated that he took this conclusion from Case Western professors,[81] and Swagelok Center Director Heuer is the only Case Western professor with any recorded interaction with the FBI in this case. But the notes from Heuer's FBI interview heavily qualify Agent Boggs's conclusion. Heuer told the FBI that the Swagelok Center instruments are "probably" not available in Iran, "but he also explained that the equipment could be located in other parts of the U.S. and

---

[77] *See* Doc. 69-1 at 8 n.2.
[78] *See* 9 F.A.M. 402.2-5(B); U.S. Dep't of State, *Business Travel to the United States*, at 2 (Mar. 2014), available at https://travel.state.gov/content/dam/visas/BusinessVisa%20Purpose%20Listings%20March%202014%20flier.pdf (hereinafter "Dep't of State Flier").
[79] *See* Dep't of State Flier at 2.
[80] Doc. 69-1 at 8.
[81] Doc. 100 at 113:21-114:8.

in other parts of the world."[82]  Heuer's characterization is consistent with Agent Boggs's admission at the *Franks* hearing that there are thousands of TEMs throughout the world and that even if Case Western's TEM is unusually powerful, it is not necessarily unique.[83]  Again, the Court finds that Agent Boggs mischaracterized the uniqueness of Case Western's facility to influence the magistrate into finding probable cause.

For those reasons, the Court finds that it must strike the above-described false information and add the above-described omitted facts to the 2013 affidavit to determine probable cause. Because of Agent Boggs's material false descriptions and omissions, if probable cause does not exist in the modified 2013 affidavit, the good faith exception cannot apply.

### 2. *Probable Cause in the* Franks-*Corrected Affidavit*

The Court finds that, with the previously discussed affidavit statements removed and material omissions included, the 2013 affidavit does not establish probable cause for either an Iran sanctions violation[84] or a false statement to a federal official.

#### a. Iran Sanctions Probable Cause Determination

The affidavit's primary remaining facts supporting an Iran sanctions violation are: (1) that Asgari worked for Sharif University, which is an Iranian state-sponsored school, and (2) that Asgari continued to minimally communicate with Sharif University affiliated individuals by email

---

[82] Def. Ex. R at 3.

[83] Doc. 100 at 114:5-19.

[84] Although the affidavit states that the Iran sanctions "creat[ed] a virtual ban on all trade with Iran," that is not strictly true. *See* Doc. 69-2 at 10.  The International Emergency Economic Powers Act explicitly exempts from the President's powers "the authority to regulate or prohibit, directly or indirectly . . . information or informational materials." 50 U.S.C. § 1702(b)(3).  The Court can find no obvious answer, and the parties have not briefed, whether Asgari's activities described in the 2013 and 2015 affidavits could fall within this "informational material" exemption.  Additionally, if Asgari's activities are not exempt, the possibility (and, given his status as a professor, likelihood) that Asgari's activities are academic in nature could raise First Amendment issues.  *See, e.g., United States v. Amirnazmi*, 645 F.3d 564 (3rd Cir. 2011) (noting  without deciding the potential First Amendment issues raised by OFAC's interpretation of the International Emergency Economic Powers Act); *Bernstein v. U.S. Dep't of State*, 974 F. Supp. 1288 (N.D. Cal. 1997) (discussing a professor's First Amendment issues arising from a similar prohibition in the Arms Export Control Act and International Traffic in Arms Regulations). However, even if Asgari's described activities are not exempt, the Court finds that the 2013 and 2015 affidavits do not state probable cause.

while he was in the United States working on a project funded by the United States Navy.

These facts do not create the substantial chance of criminal activity necessary to establish probable cause.[85]  Asgari's employment with Sharif as described in the 2013 affidavit is the same as any American professor's employment with a state university in this country.  While Sharif may receive some of its funding from the Iranian government, there is no 2013 affidavit allegation that Iran funds Asgari's research benefits from Asgari's research, or that he has previous contact with any Iranian government officials at all.

For the reasons previously discussed, the Court finds that the affidavit's reference to a Sharif University student research paper must be stricken under *Franks*.   The affidavit describes this paper as research for the Iranian Navy, but that allegation is not supported.

Similarly, Asgari's email log showing him exchanging a minimal number of emails with Sharif students does not establish probable cause.  The broad majority of the limited number of emails shown on the log are emails with students.[86]  Over three months, Asgari sent only six emails to Sharif University faculty members or Sharif University technical staff members.[87]  Asgari was a Sharif professor on a temporary leave and it is unsurprising that he would need to maintain some contact with his students.  Moreover, it seems illogic that Asgari would funnel materials to violate the Iran sanctions through students.

That Asgari worked on a project funded by the United States Navy does not turn these otherwise innocuous facts into probable cause.  By all accounts, Asgari obtained this partially military-funded job by happenstance after he was already in the United States.[88]  Once he was hired, he followed the appropriate steps to comply with America's immigration-based work

---

[85] *See Illinois v. Gates*, 462 U.S. 213, 244, n.13 (1983).
[86] *See* Doc. 69-1 at 12.
[87] *See id.* at 12.
[88] *See id.* at 10 (describing Asgari's arrival at Case Western for this job as "serendipity").

restrictions by attempting to convert his visitor's visa into an H-1B work visa.[89]

The 2013 affidavit says that the United States Navy was not notified Asgari was working on this project.[90]  But there is no indication in the 2013 affidavit, Agent Boggs's testimony, or either parties' exhibits that the Navy required either Case Western or Asgari to notify the Navy of his (or any other researcher's) presence.

These facts, admittedly, do establish the possibility that Asgari violated the Iran sanctions because Asgari had access to materials in the United States and could conceivably transfer those materials to Iran.  But a mere possibility does not show probable cause of criminal wrongdoing. Ultimately, the affidavit – shorn of its misleading statements – does not establish probable cause for a sanctions violation for the reason Agent Boggs recognized during his testimony: absent some bona fide connection to the Iranian government, these facts could apply to every Iranian researcher at Case Western.[91]

### b. False Statements to Federal Officials

The 2013 affidavit also fails to establish probable cause that Asgari made any false statements to federal officials.  With this charge, the government generally alleges that Asgari's visa application contained the false statements.[92]

In November 2012, Asgari came to the United States on a B-1/B-2 visa.[93]  By the application's terms, this visa was for "temp[orary] business [and] pleasure."[94]  In spite of Agent Boggs's testimony to the contrary, the State Department lists a permissible "business" use of this visa as including "[i]ndependent research" so long as the researcher receives "no salary/income

---

[89] *See id.*
[90] *Id.*
[91] Doc. 100 at 83:23-25.
[92] *See generally* Doc. 69-1.
[93] *Id.* at 10.
[94] *See* Def. Ex. C.

from a U.S. based source, or [provides a] benefit to [a] U.S. institution."[95]

The 2013 affidavit supports that Asgari intended to come to the United States to conduct his own research alongside a long collaborating Case Western professor. There is no indication in the affidavit that this collaborative research would benefit Case Western or that Case Western would pay Asgari to perform this research.

Asgari did eventually accept a paid position at Case Western, but according to Heuer, who hired Asgari for this job, that position did not exist until Asgari was already in the United States.[96] It seems obvious that Asgari could not lie to a federal official in his visa application about his intention to obtain a position that did not yet exist.

Beyond this, the only other potential false statement the affidavit suggests that Asgari made is that Asgari came to the United States with "the stated purpose of visiting his children."[97] For the reasons previously discussed, the Court strikes this statement about the "stated purpose" of Asgari's visit to the United States from the affidavit under *Franks* because it was a material misstatement that Agent Boggs included either knowingly or with reckless disregard for its truth.

This "stated purpose" is not actually stated anywhere within Asgari's November 2012 visa application.[98] At best for the government, that application says that Asgari's son in New York City was Asgari's point of contact in the United States.[99] But giving his New York-based son as a point of contact cannot be Asgari's "stated purpose" because Asgari specifically said in the application that he came in part for "business" purposes and had no specific travel plans.[100]

For those reasons, the 2013 affidavit, with the modifications required by *Franks*, does not

---

[95] *See* Dep't of State Flier at 2; *see also* 9 F.A.M. 402.2-5(B).
[96] Doc. 69-1 at 10.
[97] *Id.* at 8.
[98] *See* Def. Ex. C at 7-16 (visa application with intended arrival date of "15 August 2012").
[99] *Id.* at 8.
[100] *Id.*

establish probable cause to believe that Asgari made a materially false statement to a federal official.  Additionally, as the Court previously concluded, even without the *Franks* modifications the affidavit fails to establish probable cause.

The Court therefore **GRANTS** Asgari's motion to suppress the evidence obtained from the 2013 search warrant.

**B. 2015 Search Warrant**

Asgari argues that evidence resulting from the 2015 search warrant should be suppressed as fruit of the 2013 search warrant's "poisonous tree."[101]  The Court agrees.

### 1. *Fruit of the Poisonous Tree*

The fruit of the poisonous tree doctrine "bars the admissibility of evidence which [officers] derivatively obtain from an unconstitutional search or seizure."[102]  This derivative evidence will not be suppressed, however, "when 'the connection between the [illegal search] and the [evidence] had become so attenuated as to dissipate the taint.'"[103]  "The test for attenuation is whether the evidence sought to be introduced . . . 'has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"[104]

If a search warrant affidavit still establishes probable cause with all of the tainted evidence removed, the evidence obtained from that warrant should not be suppressed.[105]

The government has not opposed, either in writing or during the February 20, 2018 hearing, Asgari's argument that evidence from the 2015 search warrant is impermissible fruit of the 2013

---

[101] Doc. 67 at 12.  Asgari also argues that the 2015 warrant lacks probable cause on its face, but the Court does not address that argument because it finds that evidence from that warrant should be suppressed as fruit of the poisonous tree.

[102] *United States v. Williams*, 615 F.3d 657, 668 (6th Cir. 2010) (quoting *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008)).

[103] *Id.* at 668 (quoting *Wong Sun v. United States*, 371 U.S. 471, 491 (1963)).

[104] *Id.* at 668-69 (quoting *Wong Sun*, 371 U.S. at 488).

[105] *See United States v. Jenkins*, 396 F.3d 751, 757-60 (6th Cir. 2005).

search warrant. For that reason, the Court finds that the government has waived whatever argument it might have made on this issue.

Additionally, the government bears the burden of establishing that possibly tainted evidence is admissible either because it was obtained from an independent source or because officers would have inevitably discovered it.[106] By failing to make any argument on this point, the government has obviously not met its burden.

Even if the government had not waived any argument on this issue, the 2015 search warrant affidavit contains a significant amount of evidence obtained as a direct or probable result of the 2013 warrant. As explained below, without this tainted information the 2015 affidavit fails to establish probable cause.

Paragraphs 17-19, 21, 24, 26, and 27 of the 2015 search warrant affidavit are descriptions of Asgari's Gmail emails obtained because of the 2013 warrant.[107] According to the 2015 affidavit, in these emails Asgari communicated with individuals at Case Western prior to his arrival in the United States about obtaining letters of recommendation and funding for his sabbatical year.[108] Once Asgari was in the United States, he emailed what the affidavit describes as TEM and X-Ray Diffraction test results to students in Iran.[109]

There is no plausible way that the government could have obtained these emails except from the now-suppressed 2013 search warrant. The Court must therefore strike these tainted paragraphs from the 2015 affidavit.

The 2015 affidavit also contains two other categories of information: descriptions of emails from Asgari's Case Western email account that Case Western voluntarily gave the FBI; and

---

[106] *See Nix v. Williams*, 467 U.S. 431, 456 (1984) (Stevens, J. concurring).
[107] Doc. 69-2 at 12-15.
[108] *Id.* at 12-13.
[109] *Id.* at 13-15.

descriptions of interviews with Asgari, Heuer, Collins, and several Swagelok Company representatives. Arguably, the government could have obtained this information without using any of the "poisonous" evidence from the 2013 search warrant, thereby making it usable in the 2015 affidavit.[110]

Asgari's Case Western emails appear to be totally independent from the 2013 search warrant and therefore untainted. Case Western voluntarily gave those emails to the FBI without any apparent reference to information obtained from the 2013 warrant.[111]

In these emails, the 2015 affidavit describes Asgari's communications with Swagelok Company employee Dr. Sunniva Collins. The affidavit states "Asgari asked Collins to answer a number of questions related to the chemical compositions, temperatures at which the metals were carburized, tests on the microstructure and mechanical properties of the samples, and the chemical solution, voltage, and temperature used to electro-polish the samples."[112] Collins responded with a "table [that] contained a four-step process that described the exact gaseous mixtures, temperatures, and duration which the samples received in order to obtain the desired results."[113]

In another Case Western email, Asgari asked Collins "a series of questions related to the samples' metallography, micro-hardness, case thickness, and process of cleaning/polishing."[114] In this same email Asgari requested additional samples that were in a specific stage of development.[115]

Asgari also forwarded information from his Case Western email to his personal Gmail email.[116] The affidavit states that this information came from the Swagelok Company and could

---

[110] *See Jenkins*, 396 F.3d at 757-760.
[111] *See* Doc. 69-2 at 12.
[112] *Id.* at 14.
[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] *See id.* at 15.

be considered trade secret or proprietary.[117]

Because this information is untainted by the 2013 search warrant, the Court will consider it in determining probable cause for the 2015 search warrant.

The descriptions of FBI-conducted interviews in the 2015 affidavit, however, do not seem sufficiently attenuated from the 2013 warrant. In these interviews, a number of Swagelok Company representatives, including Dr. Sunniva Collins, describe how the partnership between Swagelok Company and Case Western operates.[118] According to the affidavit, the Swagelok representatives stated that Swagelok would consider most of the information that Asgari received during his Case Western appointment to be trade secret or proprietary.[119] Because of the secretive nature of this information, Swagelok required all of the Case Western employees working on its project, including Asgari, to sign a nondisclosure agreement.[120]

Relevant to whether this information is tainted by the 2013 search warrant, however, the FBI's interview with Swagelok Company representatives mentions that FBI agents showed these Swagelok Company representatives Asgari's emails and discussed interpretations of those emails.[121] Similarly, notes from the FBI's June 2014 interview with Swagelok Center Director Heuer describe the FBI discussing a "classified brief," which seems to contain information from Asgari's emails.[122]

It is unclear whether the FBI showed Asgari's Gmail emails, his Case Western emails, or both to Heuer and the Swagelok representatives. But because disproving taint is the government's burden, the Court construes this lack of clarity in Asgari's favor. These interviews are therefore

---

[117] *Id.*
[118] *Id.* at 19-22.
[119] *Id.*
[120] *Id.* at 21-22.
[121] *Id.* at 20-21.
[122] *See* Def. Ex. S at 4-5.

fruits of the 2013 search warrant.

Even beyond this facial connection between the 2013 warrant and these interviews, it is not obvious that the government would have obtained the information that it did in these interviews without the benefit of the 2013 warrant. It is possible, and indeed likely, that obtaining the content of Asgari's emails from Google materially affected the course of the FBI's interviews described in the 2015 affidavit.[123] Without the benefit of some argument or evidence from the government, the Court cannot find that the interviews conducted after the government obtained the 2013 warrant are untainted by the information obtained from that warrant.

### 2. *Probable Cause in the 2015 Search Warrant Affidavit*

After removing the tainted evidence from the 2015 warrant affidavit, all that remains is Asgari's travel records, Asgari's Case Western emails, and the description of Heuer's January 2013 interview that was also used in the 2013 warrant affidavit.

These facts do not support probable cause to believe that Asgari lied to a federal official, committed visa fraud, violated the Iran sanctions, or stole trade secrets.[124] For the same reasons as described in the Court's discussion of the 2013 affidavit, the travel records and Heuer's January 2013 interview do not establish a probability that Asgari lied to a federal official or committed visa fraud. Asgari's Case Western emails do not add any facts that change this analysis.

Asgari's Case Western emails are the only relevant information for finding a theft of trade secrets or Iran sanctions violation. They do not support a finding of probable cause regarding

---

[123] Because the Court is operating with limited information and without any government argument or evidence, the Court is, if anything, probably underestimating the impact that Asgari's 2013 Gmail emails had on this investigation and prosecution. Importantly, the Court is not aware of *all* of Asgari's emails obtained by the government, only those that are mentioned in either the 2015 affidavit or the parties' exhibits.

[124] There is some confusion over what statutory violations the magistrate believed the 2015 affidavit established probable cause for. The application signed by the magistrate states that the search is related to making false statements and violating the Iran sanctions. *See* Doc. 69-2 at 7. But the affidavit purports to establish probable cause for visa fraud, theft of trade secrets, and violating the Iran sanctions. *See id.* at 9-10. The Court does not attempt to resolve this ambiguity because the Court finds that the 2015 affidavit, absent tainted evidence, does not establish probable cause for a violation of any of these statutes.

either statute.  Those emails only detail communications between Asgari and his colleague on the Swagelok research project at Case Western that appeared necessary for Asgari to do his required work on that project.[125]

Asgari's transfer of a few emails to his personal email account, without more, is not sufficiently suspicious to create probable cause.  This is especially so because the affidavit does not allege that Asgari forwarded the emails containing the information he received from Collins to anyone in Iran.

Moreover, Swagelok Center Director Heuer told the FBI investigator that the Swagelok Company information that Asgari had received was all otherwise publicly available significantly undercuts a finding of probable cause regarding the theft of trade secrets or Iran sanctions. According to Heuer, not only were the relevant metal samples commercially available, but Swagelok Company patented the process Asgari worked on at Case Western.[126]  Heuer further stated that Asgari would need only these patents and a few samples to recreate Swagelok's process.[127]

Because Swagelok Company patented this process, Swagelok was required to disclose the "best mode" of carrying out the patented invention in their public patent application.[128]  Although it is possible that Swagelok advanced this process after Swagelok Company filed its patent application but before when Asgari began working at Case Western, Heuer's statements suggest this is not the case.[129]  Swagelok's patent application became public in 2011, near the 2012 time

---

[125] *See id.* at 12-15.

[126] *See id.* at 18.

[127] *Id.*

[128] 35 U.S.C. § 112; *see also Ateliers de la Haut-Garonne v. Broetje Automation USA Inc.*, 717 F.3d 1351, 1356-57 (Fed. Cir. 2013) ("To establish a [best-mode requirement] violation, it must be shown that the inventor possessed a better mode than was described in the patent, and that such better mode was intentionally concealed.").

[129] *See* Def. Ex. J (United States Patent Application Pub. No. US 2011/0030849); Doc. 69-2 at 17-18 ("Heuer had described to Swagelok employees that the only secret was that these metal qualities could be achieved, and once that secret was out," others could replicate the process.  "Heuer [ ] stated . . . that other U.S. companies had started to create commercial brands using his/Swagelok's techniques.").

that Asgari began working at Case Western.[130]  Indeed, the process described in Collins's emails to Asgari appears to be the exact same process that the Swagelok Company describes with its working examples within its patent application.[131]

Finding probable cause for theft of trade secrets or an Iran sanctions violation would therefore seemingly require the Court to assume that Swagelok Company impermissibly withheld the "best mode" of its invention in its patent application, which would risk invalidating its patent. The Court is not willing to make this leap.  Without that assumption, the facts alleged in the affidavit only show Asgari gaining access to information that is readily accessible to the general public either through the United States Patent Office or through academic publications.  This publicly available information obviously cannot be a trade secret.

Similarly, while the Iran sanctions prohibit the transfer of materials and services, they do not prohibit the transfer of information.[132]  The Government has not suggested, and the Court can find no precedent suggesting, that transferring publicly available patented and academic information to Iran violates the Iran sanctions.  It is therefore not clear that the transfer of information contained in Asgari's emails is prohibited by the Iran sanctions at all.

For those reasons the Court **GRANTS** Asgari's motion to suppress the evidence stemming from the 2015 search warrant.

---

[130] *See* Def. Ex. J; Doc. 69-2 at 16-17.
[131] *Compare* Gov't Ex. 2-4 *with* Def. Ex. K at 9-10 (providing examples of the carburization process).
[132] *See, e.g.*, 50 U.S.C. § 1703(b)(3); *see also infra* note 84.

## IV. Conclusion

For the reasons stated above, the Court **GRANTS** Asgari's motion to suppress.


IT IS SO ORDERED.


Dated:  April 3, 2018                              *s/        James S. Gwin*
                                                   JAMES S. GWIN
                                                   UNITED STATES DISTRICT JUDGE